UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LOUIS SCHWARZ, et al.,

                Plaintiffs,

vs.                                  Case No.  5:12-cv-177-Oc-34PRL

THE VILLAGES CHARTER SCHOOL, INC.,
d/b/a The Villages Lifelong Learning College,
et al.,

                Defendants.
_____/

## AMENDED ORDER

**THIS CAUSE** comes before the Court as a disability discrimination action brought

pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, et seq.,

the Fair Housing Act ("FHA"), 42 U.S.C. § 3603, et seq., and section 504 of the

Rehabilitation Act ("RA"), 29 U.S.C. § 794, et seq. Plaintiffs are thirty-two deaf persons[1] who

are residents of The Villages, a retirement community located in Florida. On October 18,

_____

[1] Plaintiffs are Louis Schwarz, Doris Schwarz, Janice Hickey, Thomas Hickey, Bernie Brown, Elizabeth Holst, Stephen Holst, Joanna Langlais, Francis Langlais, Robert Smart, Richard McElwain, Byron Zimmerman, Shirley Zimmerman, John Wilson, Charles Martin, Randall Walker, Evelyn Walker, Maureen Osgood, Carole Paul, Mary Kay Pickering, Andrew St. John, Karen Russell, Clarence Russell, Richard Woods, Linda Woods, Robert McDevitt, Lynn Stirling, Kathleen McElwain, Herbert Pickering, Barbara Achin, Ronald Achin, Diane St. John, Kenny Hynes, and Mary Wilson. See Third Amended Complaint at 1-2 (Doc. 93).
     Plaintiff Patricia Smart passed away on July 16, 2012, and on August 14, 2013, Plaintiffs filed Plaintiffs [sic] Suggestion of Death of Patricia Smart (Doc. 84; Suggestion of Death). Because more than 90 days have passed since Plaintiffs filed the Suggestion of Death, and Plaintiffs have not filed a motion for substitution of the proper party pursuant to Rule 25, Federal Rules of Civil Procedure, Patricia Smart is due to be dismissed from this action. See Rule 25(a)(1).
     On December 10, 2014, the parties filed a Stipulated Motion for Dismissal with Prejudice (Doc. 117) as to Plaintiff Carole Paul, and on December 12, 2014, the Court entered an order dismissing the claims raised by Carole Paul against Defendants (Doc. 119). On February 24, 2015, the parties filed a Stipulated Motion for Dismissal with Prejudice (Doc. 129) as to Plaintiff Joanna Langlais, and on February 25, 2015, the Court entered an order dismissing the claims raised by Plaintiff Joanna Langlais against Defendants (Doc. 130).

2013, Plaintiffs filed a Third Amended Complaint (Doc. 93; Complaint) against Defendants, the Village Center Community Development District, Sumter Landing Community Development District, and The Villages Charter School, Inc. d/b/a/ The Villages Lifelong Learning College, generally asserting that Defendants have failed to provide sign language interpreters or other reasonable accommodations so that Plaintiffs can fully enjoy and participate in Defendants' programs, activities, and services. See generally Complaint. The matter is presently before the Court on Defendants, the Village Center Community Development District and Sumter Landing Community Development District's Motion for Summary Judgment, with Incorporated Memorandum of Law (Doc. 131; Motion), filed on March 14, 2015, and Defendant, The Villages Charter School, Inc. d/b/a the Villages Lifelong Learning College's Motion for Summary Judgment and Memorandum of Law (Doc. 132; Motion), filed on March 16, 2015.  On April 13, 2015, Plaintiffs filed Plaintiffs' Memorandum of Law in Opposition to Defendants, the Districts' Motion for Summary Judgment (Doc. 140; Response) and Plaintiffs' Memorandum of Law in Opposition to Defendant, The Villages Charter School Inc.'s Motion for Summary Judgment (Doc. 141; Response).[2]

On September 2, 2015, the Court held the Final Pretrial Conference, during which the Court heard oral argument by counsel on the Motions for Summary Judgment, see Clerk's Minutes (Doc. 177; Clerk's Minutes).  At the Final Pretrial Conference, the Court ordered

---

[2] The Court will address Defendants, the Village Center Community Development District and Sumter Landing Community Development District's Motion for Summary Judgment, with Incorporated Memorandum of Law (Doc. 131) in Section I of this Order, before turning to Defendant, The Villages Charter School, Inc. d/b/a the Villages Lifelong Learning College's Motion for Summary Judgment and Memorandum of Law (Doc. 132) in Section II.  Because there is no overlap in analysis between the two motions, the "Motion" and "Response" cited in Section I will refer to Docs. 131 and 140, and the "Motion" and "Response" cited in Section II will refer to Docs. 132 and 141.

supplemental briefing from Plaintiffs and Defendant The Villages Charter School, Inc.  Id. As such, at the Court's direction, Defendant The Villages Charter School, Inc., filed Defendant, The Villages Charter School, Inc., d/b/a The Villages Lifelong Learning College's Supplemental Briefing in Support of its Motion for Summary Judgment and Incorporated Memorandum of law (Doc. 179; Defendant's Supplement) and Plaintiffs filed Plaintiffs' Supplemental Brief (Doc. 180; Plaintiffs' Supplement).  Accordingly, the matter is ripe for review.

I.     **Defendants, the Village Center Community Development District and Sumter Landing Community Development District's Motion for Summary Judgment, with Incorporated Memorandum of Law  (Doc. 131)**

      A.     **Background**

      The Villages is a residential community designed and managed for retired residents aged 55 and older.  It has over 100,000 residents and over 50,000 single-family homes. See Affidavit of Deborah Franklin ¶ 2 (Doc. 131-2; Franklin Aff.).  The Villages is comprised of 15 community development districts, which are governmental entities created pursuant to Florida Statute section 190.01, et seq.  See Affidavit of Janet Y. Tutt ¶ 3 (Doc. 131-1; Tutt Aff.).[3]  The defendants in this action, the Village Center Community Development District

---

[3] Florida Statute section 190.003 defines a "community development district" as the following:

> a local unit of special-purpose government which is created pursuant to this act and limited to the performance of those specialized functions authorized by this act; the governing head of which is a body created, organized, and constituted and authorized to function specifically as prescribed in this act for the purpose of the delivery of urban community development services; and the formation, powers, governing body, operation, duration, accountability, requirements for disclosure, and termination of which are as required by general law.

FLA. STAT. § 190.003(6).

("the VCCDD") and Sumter Landing Community Development District ("SLCDD") (together, "the Districts"), are the two primary residential districts in The Villages.

### 1. The Village Center Community Development District and Sumter Landing Community Development District

Both the VCCDD and SLCDD are local units of a special purpose government. Tutt Aff. ¶ 3. As such, the Districts must adhere to the same Florida Statutes and Administrative Codes as any municipality. Id. Janet Tutt ("Tutt") is the District Manager for the Districts and an employee of the VCCDD. Id. ¶ 2. As District Manager, Tutt is the Chief Operating Officer for the Districts and is appointed by the VCCDD Board of Supervisors, which is elected by landowners in The Villages. Id. ¶ 7. As the governmental structure of the Districts is similar to that of a Florida city, Tutt's position is "essentially equivalent of that of a City Manager[,]" making her the Districts' decision-maker. Motion at 4.

The Districts are not to be confused with the Developer of The Villages, The Villages of Lake Sumter, Inc. Tutt Aff. ¶ 4. As a for-profit corporation, the Developer is a private entity and is the entity that sells homes to residents of The Villages. Id.

### 2. The Districts' Recreation Department

The Districts have numerous departments, which include, but are not limited to, Human Resources, Public Safety, Finance, Property Management, and Recreation. Tutt Aff. ¶ 3; Exhibit A to Tutt Affidavit (Doc. 131-1; Tutt Aff., Ex. A). Through the Recreation Department, the Districts provide a vast array of recreational facilities for use by residents and their guests and which include 33 executive golf courses, 45 Neighborhood Recreational Centers, 23 Village Recreational Centers, and 9 Regional Recreational Centers. Tutt Aff.

¶¶ 8-9; <u>see</u> <u>also</u> Exhibit C to Tutt Affidavit (Doc. 131-1, Exhibit C; Tutt Aff., Ex. C).  The Recreation Department also provides residents with over 70 pools, numerous tennis and pickle ball courts, and many other facilities.  Tutt Aff. ¶ 8.  The Districts' Recreation Department has approximately 483 employees, the majority of whom work at recreation centers throughout The Villages.  <u>See</u> Affidavit of John B. Rohan ¶ 3 (Doc. 131-5; Rohan Aff.).

### 3.    The Amenities Fees

All property owners in The Villages pay a monthly amenities fee, which is set forth in the Declaration of Restrictions applicable to each resident's property.  Tutt Aff. ¶ 5; <u>see</u> <u>also</u> Exhibit B to Tutt Affidavit at 4 (Doc. 131-1, Exhibit B; Tutt Aff., Ex. B).  The Declaration of Restrictions provides that "[t]he Developer or its designee shall perpetually provide the recreational facilities" and that "[e]ach Owner hereby agrees to pay the Developer, or its designee, a monthly fee or charge ('Amenities Fee') against each Lot for [the recreational] services described . . . above[.]"  <u>See</u> Tutt Aff., Ex. B ¶¶ 4.1(a), 4.2.  The Districts, through issuance of bonds, purchase the Amenities Fee revenue stream and related infrastructure from the Developer.  Tutt Aff. ¶ 6.  Thus, the designee referenced above in the Declaration of Restrictions is the Districts after the transfer of the Amenities Fee revenue stream.  <u>Id.</u>; <u>see</u> <u>also</u> Deposition of John Rohan dated July 17, 2014 at 37-38 (Doc. 144-5; Rohan Dep. II) (testifying that "The Villages pay [A]menities [F]ees" and that "those [A]menities [F]ees ultimately go to the [D]istricts").  Approximately 93% of the VCCDD's revenue comes from Amenities Fees.  Tutt Aff. ¶ 6.

The Amenities Fees paid by homeowners in The Villages are used for Recreation Department facilities, as well as non-structural expenditures including the volunteer appreciation event, parades, and social events.  See Deposition of John Rohan dated June 27, 2014 at 32 (Doc. 144-4; Rohan Dep. I); Deposition of Janet Tutt dated January 29, 2015 at 12 (Doc. 144-3; Tutt Dep. II); Rohan Dep. II at 38.  The Amenities Fees also pay for handicap ramps for the various recreational facilities.  Tutt Dep. II at 18-19.  The allocation of the Amenities Fees are structured this way because the Districts own the Recreation Department facilities, and the purpose of the revenue stream is to operate and maintain those facilities for the benefit of the residents.  Id. at 19.[4]

### 4.  The Resident Lifestyle Groups

The Resident Lifestyle Groups ("RLG" or "RLGs") are the predominant users of the Recreation Department facilities.  Tutt Aff. ¶ 9.  The RLGs are comprised of over 2,000 clubs covering a wide range of interests such as card clubs, education clubs, numerous and varied exercise clubs, multiple AA support groups, college alumni groups, theatrical and musical groups, and much more.  See Company Listing Report (Detail) (Doc. 131-40).  RLGs are created by "resident volunteers", also called "group leaders" (hereinafter referred to as "RLG volunteer(s)").  Tutt Aff. ¶ 10.  Only residents of The Villages are permitted to become RLG volunteers and to create RLGs.  Rohan Aff. ¶ 4; see also Deposition of Pam Henry at 21 (Doc. 144-1; Henry Dep.).  Likewise, only residents of The Villages are able to join RLGs as members.  Henry Dep. at 41; Tutt Dep. I at 49.  Nonresidents may not do so because

---

[4] Tutt testified that "[t]he recreation facilities are owned by the Village Center District" and that "[t]he . . . revenue stream . . . was purchased by the Village Center District[.]" Tutt Dep. II at 19.

residents of The Villages pay Amenities Fees, and the Amenities Fees are used to support the RLGs' use of Recreation Department facilities.  Henry Dep. at 21-22, 41-42; Tutt Dep. I at 49-50.[5]  As such, RLGs do not have to pay a rental fee to use the Recreation Department facilities.  Tutt Dep. I at 50.  The general public and groups from outside The Villages are permitted to use Recreation Department facilities, but are required to pay a rental fee.  Id.

### i.    Formation of a Resident Lifestyle Group

The Recreation Department encourages residents to form RLGs.  Tutt Aff. ¶ 11; see Rohan Column ("Many Recreation Changes") (Doc. 144-4, Exhibit 4; Rohan Column ("Many Recreation Changes"));[6] Rohan Column ("New year full of new possibilities") (Doc. 144-4, Exhibit 6; Rohan Column ("New year full of new possibilities"));[7] Districts' Website Flyer (Doc. 144-1, Exhibit 1; Districts' Website Flyer).[8]  A resident initiates the application process

---

[5] Additionally, "[t]he recreation centers are outfitted with equipment and supplies for residents to use." Rohan Dep. I at 75.

[6] In this column, Rohan announces the opening of a new recreation center and indicates that recreation staff "is putting out the all-call to any resident who would love to volunteer by leading an activity for your fellow residents." Rohan Column ("Many Recreation Changes").  He writes, "If you are interested or would like to know more about being a volunteer for the Recreation Department, please contact Pam Henry at 753-1716 or pam.henry@districtgov.org."  Id.

[7] In this column, Rohan writes,

> To help us grow, we are always trying to recruit residents to become part of our resident lifestyle volunteer team to assist us in providing activities.  If you love our core values of hospitality, creativity and innovation, hard work and stewardship, please contact any recreation center manager to learn more.  We would love to have you on our team.

Rohan Column ("New year full of new possibilities").

[8] This flyer lists the steps to create an RLG.  See Districts' Website Flyer.  It also states,

> With your help, we look forward to the opportunity to enhance our lifestyle services.

(continued...)

for an RLG by completing a Resident Survey Request Form and a Volunteer Application and submitting these documents to the Recreation Department.  Henry Dep. at 10; <u>see also</u> Exhibit B to Rohan Affidavit at 3 (Doc. 131-5, Exhibit B; Rohan Aff., Ex. B).  The Resident Survey Request Form solicits information including a description of the proposed club, the club's leader, the club's preferred meeting location, and the club's preferred meeting time. Henry Dep. at 10; <u>see also</u> Rohan Aff., Ex. B at 13.[9]

The record contains two versions of the Volunteer Application which differ substantially.   The earlier version is dated October 4, 2011, and labeled "Volunteer Application Sheet."  <u>See</u> Exhibit C to Rohan Affidavit at 14-15 (Doc. 131-5, Exhibit C; Rohan Aff., Ex. C).  This version solicits the applicant's name; the applicant's emergency contact; the reason why the applicant wants to volunteer; information about the applicant's most recent volunteer experience; special skills, training, and experience; and references.  <u>See</u> Rohan Aff., Ex. C at 14-15.[10] The older version of the application also includes a section

_____

[8](...continued)

<div align="center">VCDD Recreation</div>

<u>See id.</u>

[9] The record contains an earlier version of the Resident Survey Request Form which does not substantively  differ from the more recent version.  <u>See</u> Exhibit C to Rohan Aff. at 13 (Doc. 131-5, Exhibit C).

[10] John Rohan, the Recreation Director for the VCCDD and SLCDD, testified that even though the earlier version of the Volunteer Application "says the word application on it", the document was meant to "gather[ ] information about the resident."  Rohan Dep. I at 7-8, 19, 29.  Rohan also explained that with the question asking why the applicant wants to volunteer, the Recreation Department intended to give the applicant an "individual checklist" to make sure they want to "run their activities for other residents."  <u>Id.</u> at 21-22. Additionally, Rohan testified that in asking for applicants' availability, this question was "really for the residents to know when they're available."  <u>Id.</u> at 23.  Rohan further testified that he does not check references and is not sure if anyone in his department calls references.  <u>Id.</u> at 24; <u>see also</u> Rohan Aff. ¶ 15 (testifying that "[t]he Recreation Department does not approve the group leader, other than making certain the person is a resident of [T]he Villages").   Pam Henry, the Recreation Manager for the RLGs, also testified that although the application asks for references, they "generally do not call the references."  Henry Dep. at 6, 15.

<div align="right">(continued...)</div>

labeled "Applicant Statement" which required the applicant to check off the following statement, "Should my application be accepted, I agree to be bound by the resident lifestyle guidelines and to refrain from any misconduct in the performance of my services on behalf of the VCDD Recreation Department."  Rohan Aff., Ex. C at 15.[11]

A more recent version of the Volunteer Application is dated December 6, 2013, and November 10, 2014, and labeled, "Volunteer Information Sheet[.]"  See Rohan Aff., Ex. B at 14.  Unlike, the older version of the Volunteer Application, this document does not request references; information about why the applicant wants to volunteer; the applicant's most recent volunteer experience; or the applicant's special skills, training, and experience.  Id. Additionally, it does not have an "Applicant Statement" section, so the applicant is not required to check off the statement quoted above regarding "refrain[ing] from any misconduct in the performance of my services on behalf of the VCDD Recreation Department."  Id.

---

[10](...continued)
In his Affidavit, Rohan further explained:

> Prior Resident Lifestyle Volunteer documents, which have been recently rewritten, required the person seeking to be a group leader to fill out a volunteer application sheet providing information regarding volunteer experience, references and skills and training. . . . The information requested by this form was never checked, nor was a resident ever denied group leader status because of the information, or lack thereof, provided.  This form should no longer be used for Resident Lifestyle Volunteers, though a version of it remains in use for true volunteers, that is individuals who volunteer to assist during Recreation Departments sponsored activities.

Rohan Aff. ¶ 15.  Plaintiffs have submitted no evidence disputing Rohan's characterization of the Volunteer Application.

[11] When asked whether RLG volunteers are "performing services on behalf of the VCDD recreation department", Rohan testified that "[n]o, they're performing on behalf of themselves and the clubs" and admitted that "the words may not be absolutely correct" but that "the intent was to protect the district, the staff and the employees and the use of the facilities."  Rohan Dep. I at 25-26.

Once an applicant completes the Volunteer Application and Resident Survey Request Form, the Recreation Manager for the RLGs, Pam Henry,[12] and her supervisor, the Recreation Director for the VCCDD and SLCDD, John Rohan, review these documents for approval.  See Henry Dep. at 10.  Rohan testified that as part of the RLG application process, "[t]he Recreation Department does review the activity being promoted by the club to make certain that it is legal, is being organized by and for Villages residents, is not unreasonably duplicative of existing clubs, and is not a guise for proprietary activity."  Rohan Aff. ¶ 6.  Similarly, Henry testified that if an application for a new RLG is not approved it is "because there's plenty of them already and there's space available in those clubs or activities."  Henry Dep. at 11.

Once Henry and Rohan approve the forms, the Resident Survey Request Form is published for two weeks in the Recreation News,[13] a media outlet published by The Villages Media and paid for by the Recreation Department, to gauge residents' interest level.  Henry Dep. at 11, 18-19; see also Rohan Aff., Ex. B at 3.  The prospective RLG volunteer is listed as the contact person for the Resident Survey Request Form and in that capacity, receives and tallies the responses.  See Exhibit 1 to Rohan Dep. I (Doc. 144-4, Exhibit 1; Rohan Dep. I, Ex. 1); Henry Dep. at 11.  After the two-week survey is completed, the prospective RLG volunteer meets with Henry to determine whether there is sufficient interest to establish the

---

[12] Rohan testified that approximately 60 percent of Henry's work is "interfac[ing] and facilitat[ing]" the RLGs, while the other 40 percent is devoted to other activities of the Recreation Department, including "[p]lanning other senior games, Camp Villages, working with our facility folks[,] and working with supervisors." Rohan Dep. II at 80-81.  The senior games and Camp Villages are District-sponsored events. Id. at 18-19.

[13] The Recreation News is printed every Thursday as a supplement of the Villages Daily Sun newspaper.  See Rohan Column ("Many Recreation Changes").  It is "by far . . . the most up to date information of all the activities taking place at" the recreation centers.  Id.

proposed RLG.  Henry Dep. at 11;  Rohan Dep. I, Ex. 1.  If Henry, at Rohan's direction,

determines that there is sufficient interest, she approves the Resident Survey Request Form

and meets with the RLG volunteer to discuss meeting space and times.  Henry Dep. at 13;

Rohan Aff., Ex. B at 3.  After Henry and the RLG volunteer agree on a meeting space and

time, they meet again to review the Resident Lifestyle Volunteer Guidelines and to sign a

facility permit, which Henry describes as a "room contract" to keep that meeting day, time,

and location.  Henry Dep. at 14;  Rohan Dep. I, Ex. 1; see generally Rohan Aff., Ex. B.[14]

    Once an RLG is formed, the RLG volunteers lead the RLG, reserve rooms for the

RLG at the recreation facilities at no charge, and act as the contact person with the

Recreation Department.  Rohan Aff. ¶¶ 4, 14.  Additionally, RLG volunteers can advertise

the meeting times and places for their RLG in the Recreation News.  Henry Dep. at 14.[15]

---

[14] According to Henry, once RLGs are established, the RLGs meet in the Recreation Department facilities, and at that point, RLG volunteers' "day-to-day interactions" are with the recreation services representatives at the regional centers to address issues like making changes to the RLGs' meeting day, time, or location, or other special requests. Henry Dep. at 9.  These requests then go to Henry for approval. Id.

[15] Plaintiffs, in the Response, and counsel for Plaintiffs, at oral argument, assert that the RLGs are created under and encompassed by the Districts' "Resident Lifestyle Volunteer Program."  However, nothing that Plaintiffs cite supports their position that the RLGs are subsidiary to a larger organization or program called the "Resident Lifestyle Volunteer Program."  For example, in their recitation of the facts, Plaintiffs assert that "[t]he Districts survey residents' interest in the establishment of certain activities and have final approval of whether the activity will become part of their Resident Lifestyle Volunteer Program ("Program")" and cite Henry's deposition.  Response at 8.  In the cited portion of her deposition, Henry explains the approval process for prospective RLGs.  See Henry Dep. at 11-13.  Nowhere does Henry mention the existence of a "Program." Additionally, Plaintiffs include in the Response an illustration which they assert, based on the "documentary evidence", represents the structure of the Districts.  Id. at 7-8 n.3.  This illustration is a triangle, with "The Districts" at the top, "The Recreation Department" below that, "Resident Lifestyle Volunteer Program" below that, and "Resident Lifestyle Groups" at the bottom.  Id.  Plaintiffs include no citations in support of this illustration. Plaintiffs further assert that the "Resident Lifestyle Activities are part of the Districts' recreational activities operations, and are created under the Program."  Id. at 9.  In support of this statement, Plaintiffs cite the Resident Lifestyle Volunteer Guidelines and supporting documents attached to the Complaint.  See Doc. 93-1. Nowhere do these documents reference a "Resident Lifestyle Volunteer Program."  As additional support for this statement, Plaintiffs cite Tutt's deposition and Exhibit 6 attached to Tutt's deposition.  Exhibit 6 contains no reference to a "Resident Lifestyle Volunteer Program."  See Exhibit 6 to Tutt Dep. II (Doc. 144-3, Exhibit 6). Plaintiffs also cite another portion of Tutt's deposition and Exhibit 7.  Exhibit 7 is a letter dated October 19, 2009,
(continued...)

## ii.    Resident Lifestyle Volunteer Guidelines

One of Rohan's duties is to make sure that RLG volunteers are "compliant" with the

Resident Lifestyle Volunteer Guidelines.  Rohan Dep. I at 65; see Rohan Aff., Ex. B; Rohan

---

[15](...continued)
written by Tutt to a woman named Ellen Rainhart.  See Exhibit 7 to Tutt Dep. II (Doc. 144-3, Exhibit 7; Tutt Dep. II, Ex. 7).  In this letter, Tutt informs Ellen Rainhart that "[i]t is strictly against the Resident Council Guidelines [now known as the Resident Lifestyle Volunteer Guidelines] to charge any fee, donation or contribution for your time or services" and that she cannot collect any type of "instructional fee."  Id.  The only reference to the word "program" in this letter is the following sentence: "The Resident Council Guidelines provide the operating guidelines and expectation for our participants and volunteers included in the variety of recreation activities and programs offered."  Id.  Plaintiffs also cite Exhibit 6 to Rohan's deposition and Exhibit 9 to Henry's deposition.  Exhibit 6 to Rohan's deposition is cited in the body of this Order, see supra at 7, and contains no reference to the "Resident Lifestyle Volunteer Program."  See Rohan Column ("New year full of new possibilities").  Exhibit 9 to Henry's deposition is an article in which Henry is quoted saying, "My primary responsibility is creation, implementation and oversight of the over 2,000 volunteers leading clubs and activities. . . . I also have oversight of all programs/activities that recreation staff manages; i.e., special events, socials, sports, pool programming, leagues, et cetera."  See Exhibit 9 to Henry Dep. (Doc. 144-1, Exhibit 9; Henry Dep, Ex. 9).  The Court, therefore, declines to give credence to Plaintiffs' argument that the Districts operate a program called the "Resident Lifestyle Volunteer Program" or that the individual activities of each RLG are a program of the Districts because such activities are part of an overall "Resident Lifestyle Volunteer Program" operated by the Districts.

Moreover, Plaintiffs' imprecise use of record citations in support of its assertions regarding the "Resident Lifestyle Volunteer Program" is representative of a more global issue with Plaintiffs' Response which rendered preparation of this Order a cumbersome task.  Indeed, the Court found that multiple times throughout the Response, Plaintiffs' recitation of the facts mischaracterizes the cited testimony or represents the evidence in ways which go beyond what can be a fair inference supported by the record.  For example, Plaintiffs assert that "[t]he Resident Lifestyle Activities, which include the Resident Lifestyle Groups, are supported by the Amenities Fees" and cite Tutt's depositions.  See Response at 5.  In the first deposition cited by Plaintiffs, Tutt testifies that only "residents and their guests, if there's room, can enter" the "Villages . . . lifestyle groups" because the facilities which these groups use "are paid for with [A]menities [F]ees[.]" Tutt Dep. II at 39-40.  In the second deposition cited by Plaintiffs, Tutt testifies that the Districts "do not allow non-residents into those activities [the RLGs] because the rooms are funded through the amenity fees[.]" Tutt Dep. I at 49.  This testimony by Tutt does not indicate that the "Resident Lifestyle Activities" are an umbrella entity under which the Resident Lifestyle Groups are included.  Moreover, this testimony does not indicate that the RLGs are supported by the Amenities Fees.  It indicates that the recreation facilities, which RLGs use, are supported by Amenities Fees.

By way of another example, Plaintiffs assert that through the Resident Lifestyle Volunteer Guidelines, the Districts "require the Resident Lifestyle Volunteer to get approval from the Districts before a meeting can be cancelled."  Response at 16.  However, the Court's review of the Guidelines indicates that "[t]he group contact person is responsible for notifying the Recreation staff of any changes to the Facility Permit such as contact(s), meeting cancellations, room changes, day, times, or locations, and should notify the media of meeting changes or cancellations."  Rohan Aff., Ex. B at 6; Rohan Aff. Ex. C at 6.  Additionally, the Guidelines require that, "[t]o make a change to a room reservation, the group contact must complete and submit a Resident Lifestyle Room Change Request Form to any Regional Recreation Center staff member", and that "[r]oom changes must be approved by Recreation and will be based on room availability."  Id.  However, there is no indication in the Guidelines that an RLG volunteer must get approval before cancelling a meeting.

Aff., Ex. C.[16]   Statements included in the Resident Lifestyle Volunteer Guidelines under the

heading "Resident Lifestyle Group Information" are as follows:

- Membership in a Resident Lifestyle Group shall be restricted to residents of The Villages.
- Participants must be at the appropriate level of experience and knowledge to join an activity as determined by a group leader.
- Resident Lifestyle Groups must meet a minimum of four times in a fiscal year (October-September) in order to maintain their Resident Lifestyle Group status.
- Groups may add up to 8 additional meeting dates per year.
- Resident Lifestyle Groups shall maintain a list of group members and provide that list to the Recreation Department upon request.
- Members are required to present their Resident ID to attend each activity.
- Eligible guests may attend a Resident Lifestyle sponsored activity. An eligible guest is any person who is registered in the Guest ID Card system.
- Eligible guests must present a valid Guest ID and photo ID prior to attending any Resident Lifestyle activity.  Guests are not eligible to become members of a Resident Lifestyle Group.
- Resident Lifestyle Groups are allowed to have non-resident guest presenters/speakers on a limited basis with prior approval by the Director of Recreation[.]
- Support Groups, defined as a non-funded group with health conditions that are recognized through the American Medical Association to qualify, are allowed to have up to 10 non-qualified guests attend their meetings at District facilities.  Support Groups must be approved by the Director of Recreation.
- Resident Lifestyle Groups are encouraged to provide the group's expectations, membership requirements, dues and other fees, etc., prior to residents joining.
- Resident Lifestyle Groups that charge membership dues or fees are required to notify their members, publicize these charges, and account

---

[16] However, Rohan also testified that his job is really to make sure that the volunteers are "educated" about the guidelines and about "the expectations of them."  Rohan Dep. I at 65.  Yet, he also testified that "[i]f there's a violation that could impact the public safety, health welfare yes, we would want compliance there." Id. at 66.

for the purpose and use of fees.  The responsibility for recording all financial information belongs to the Resident Lifestyle Group.[17]

- The records (membership, bylaws, financial, operating procedures, etc.) of each Resident Lifestyle Group shall be open to participating residents upon reasonable notice.
- The use of Recreation Department equipment [sic] copiers, coffee, Recreation equipment is based on availability[.]
- The Resident Lifestyle Group(s) shall agree to abide by the policies and procedures of the Recreation Department and the Village Community Development Districts.
- All groups are subject to review by the Recreation Department or the Village Community Development Districts.
- There is limited storage at Recreation Centers; any storage of items must have prior approval by the Director of Recreation.

See Rohan Aff., Ex. B at 3-4; Rohan Aff. Ex. C at 3-4.  The Resident Lifestyle Volunteer Guidelines also include additional information related to guidelines for RLGs which collect fees, and procedures for scheduling rooms,[18] and information related to facility permits,[19] among other topics.  See generally id.  Of particular relevance to this action, the Resident Lifestyle Volunteer Guidelines include a section regarding the Americans with Disabilities Act and auxiliary aids.  This provision states the following:

───────────────────

[17] Henry testified that "dues are not against district policy" because they pay for the functions of the RLGs. Henry Dep. at 18. Relatedly, although the Districts do not control whether a club charges a membership fee or the amount charged, "[t]he Districts will advise clubs that members are entitled to review the financial records of the clubs but the Districts will not do so."  Rohan Aff. ¶ 9.

[18] This provision states that while RLGs "that have already been scheduled take priority over rentals however, District Operated or Sponsored events shall have priority in the scheduling of facilities."  See Rohan Aff., Ex. B at 5.

[19] As noted, the RLG volunteer "is responsible for notifying the Recreation staff of any changes to the Facility Permit such as contact(s), meeting cancellations, room changes, day, times, or locations and should notify the media [the Recreation News] of meeting changes or cancellations."  Rohan Aff., Ex. B at 6; Rohan Aff. Ex. C at 6.

## XVII.  ADA

The following information regarding ADA Auxiliary Aids will provide clarification for managing and directing requests for auxiliary aids for activities at District owned and operated facilities.  The person, entity or organization requesting and receiving a facility permit for rental of a District facility shall have the sole responsibility to accommodate qualified individuals pursuant to the Americans with Disabilities Act (ADA).  This language will also appear on all Facility Permits issued for any District owned or operated facility:

- District Sponsored Event: If the District organizes or is otherwise in charge or plays an integral part in the event or activity, the District will provide accommodations to a person that is impaired subject to the District's "Policy for ADA Accommodations".

- Non-District Sponsored Event: Resident Lifestyle Volunteer Group Event: Resident Lifestyle Groups are volunteer and non-profit entities which sponsor activities, meeting and events separate from District operations, entities and functions. Requests for auxiliary aids for Resident Lifestyle sponsored events should be directed to the Resident Lifestyle Group Contact listed on the Facility Permit.  The Resident Lifestyle Group Contact shall determine the provisions for providing auxiliary aids on a case by case basis, determining whether the request would place an undue hardship on the Resident Lifestyle Group.

- Non-District Sponsored Event: Rental of Facilities: An individual(s) or group(s) sponsors activities, meetings and events separate from District operations, entities and functions. Requests for auxiliary aids for rental or facility events should be directed to the Contact listed on the Facility Permit.  The Contact shall determine the provisions for providing auxiliary aids on a case by case basis, determining whether the request would place an undue hardship.

Rohan Aff., Ex. B at 11; Rohan Aff., Ex. C at 11.

### iii. Recreation Department involvement with RLGs

In explaining the Districts' involvement with the RLGs, Tutt testified as follows:

> The content of club meetings, providing [sic] the Districts do not become aware of the illegal, destructive, or proprietary activities, is of no concern to the Districts. Whether John or Jane is the group leader is likewise of no relevance to the Districts, as long as that person is a resident and his or her contact information has been provided. The Districts' concern focuses on facilitating the efficient use of its recreation centers.

Tutt Aff.¶ 20; see also Tutt Dep. I at 65-66 (explaining that the function of the Districts with respect to the RLGs is to "provide [the RLGs] facilities in a framework", "to provide an organized mechanism" for scheduling the RLGs, and to avoid a situation where there is "no accountability for the use of the room and consideration of the facilities"). Tutt further explained that with over 2,000 groups "vying for space", the Districts' function is to "make sure there [is] a balance" of RLGs using the recreation facilities. Tutt Dep. I at 66. According to Tutt, the RLGs provide recreational activities which supplement the vast array of recreational activities provided by the Districts, but the RLGs do not replace the Districts' recreational functions. Tutt Aff. ¶ 21.

Tutt has explained that the Districts do not regulate the content of the programs and services offered by the RLGs "other than to the extent they will not allow proprietary or illegal operations in the facilities."[20] Tutt Aff. ¶ 15; see also Rohan Aff. ¶ 7 ("The Districts do not regulate or supervise the activities of clubs other than to expect compliance with its facility guidelines."). As such, RLGs "that use the Districts' facilities are subject to the Districts'

---

[20] To that end, the Recreation Department has disbanded at least one RLG, the travel club, because the group leader was taking "cutbacks" from travel agencies in violation of "district policy" prohibiting proprietary operations within a recreation facility. Henry Dep. at 16-17.

Facility Guidelines" but "[t]hese guidelines are no different than the guidelines imposed upon residents using the facilities, or outside parties who have rented the facility." Tutt Aff. ¶ 13; <u>see</u> Tutt Dep. I at 68 (testifying that the Recreation Department is in charge of enforcing the "code of conduct" with respect to RLGs but qualifying that the Recreation Department ensures that "everybody who utilizes" the Districts' facilities complies with the code of conduct). Similarly, Recreation Department employees check the identification of all persons who use recreation facilities regardless of whether the person is a member of an RLG using the facilities or a nonresident using the facilities. Rohan Aff. ¶ 7. Indeed, Henry testified that nonresidents can use the recreational facilities, but they must have a valid guest ID card. Henry Dep. at 103.

Although the Districts do not control membership of RLGs except to ensure that members are residents of The Villages, Recreation Department personnel may, upon request from a resident, suggest appropriate clubs and provide the resident with the contact information for the appropriate group leader. Rohan Aff. ¶ 10. Similarly, if a resident wants to create a new RLG, but that prospective group leader is only available seasonally, the Districts will "put a call out for volunteers to assist those residents to get someone else to come in to set a group up." Tutt Dep. I at 53. The Recreation Department also organizes a quarterly "communication meeting" to provide information to the RLGs about recreation center closings, projects taking place, community news, and updates. Rohan Dep. I at 48-49. However, RLG volunteers are not required to attend these meetings. <u>Id.</u> at 49.

Annually, the Recreation Department contacts the RLG volunteers to obtain the volunteer leaders' facility permits in order to update the information on the Districts' website

regarding what programs will be held in the recreation facilities.  Rohan Dep. II at 83-84.

The facility permit is key to being an RLG volunteer: If a resident decides he or she no

longer wants to be an RLG volunteer, the Recreation Department will rescind the facility

permit.[21]  Id. at 85.  As such, Rohan testified that

> [t]he Recreation Department's involvement with resident clubs is due to and
> required by club usage of recreation facility rooms and equipment.  If residents
> of The Villages wish to form a club, but do not wish to use recreation facility
> space, the Recreation Department would have no contact with said group.

Rohan Aff. ¶ 5.

In their depositions, Plaintiffs were asked about and testified to their beliefs regarding

the creation and function of the RLGs.  For example, Plaintiff Louis Schwarz testified to his

belief that the Districts control who the leader of an RLG is because "if the VCDD sees that

people have interest in a particular subject matter, they may try to find a leader that may

become proactive in trying to find a leader amongst those people that are interested in that

particular area of interest[.]"  See Deposition of Louis Schwarz at 17 (Doc. 131-6; Schwarz

Dep.).  However, Schwarz was not able to identify a specific club leader "appointed" by one

of the Districts but rather testified that this "maybe" occurred with the Prius Club, the

Photography Club, the Computer Club, or the Genealogy Club.  Id. at 18.  Schwarz further

testified that the Districts have control over what goes on during RLG meetings because

"[t]he VCDD has policies and guidelines that they have to explain explicitly what it is they can

and cannot do."  Id. at 21.  Additionally, Schwarz testified that the Districts provide

---

[21] Indeed, the RLGs' facility permits indicate the groups' meeting times, and these times are advertised in the Recreation News, posted at the recreation centers, and posted on the Districts' website.  Rohan Aff., Ex. B at 6; Rohan Aff. Ex. C at 6.

"supervision" during RLG meetings because employees of the recreation center will tell residents they need to vacate the recreation rooms when their scheduled meeting time is up. Id. at 22-23. Plaintiff Janice Hickey testified that it is her understanding that The Villages operate the RLGs because the clubs are located in The Villages. Deposition of Janice Hickey at 58-59 (Doc. 131-8; Hickey Dep.). Plaintiff Richard McElwain testified that he believes the RLGs and the Districts "are the same" because he "bought into the whole package . . . the lifestyle[.]" Deposition of Richard McElwain at 15 (Doc. 131-16; McElwain Dep). According to McElwain, he chose to live at The Villages "because of the different activities and the conglomerate of all the different clubs and active lifestyle that's promoted here." Id. at 15-16. However, McElwain also testified that he now understands that the "VCDD keeps [the RLGs] separate[.]" Id. at 21. Plaintiff Byron Zimmerman testified that he believes the Corvette Club is "the CDD's Corvette group" because it is advertised in the Recreation News and because he believes it is included in the "lifestyle" at The Villages. Deposition of Byron Zimmerman at 25 (Doc. 131-17; Zimmerman Dep.). He further testified that because the "VCDD accepts [the RLGs] in order to list them in the Recreation News[,] . . . it's almost implied that the VCDD is responsible for those very things and sanctions those clubs[.]" Id. at 26-27. Finally, Plaintiff Lynn Stirling testified that she believes that it is the responsibility of the Districts to provide sign language interpreters because "[i]t's part of . . . the amenities." Deposition of Lynn Stirling at 126 (Doc. 131-31; Stirling Dep.).

### 5. Camp Villages

The "Camp Villages" event is a District-sponsored activity designed for residents of The Villages and their grandchildren. Rohan Dep. I at 32-34, 78. Camp Villages is a single-

day event led by volunteers and funded by a combination of registration fees and Amenities Fees.  Id. at 32-34.[22]  Henry testified that she has "had a deaf person apply to Camp Villages[.]" Henry Dep. at 99.  She "believe[s]" it was Plaintiff Louis Schwarz, and she "know[s] that [the Recreation Department] provided an interpreter for the program." According to Henry, "[i]f it wasn't Mr. Schwarz, it was one of the individuals." Id.

### 6.    The Districts' ADA Accommodations Policy

Beginning in 2008, Plaintiff Louis Schwarz requested that the Districts provide sign language interpreters for RLG activities.  See Schwarz Dep at 13-16.   In response to Schwarz's 2008  requests, the Districts' attorney formulated the original framework for the Districts' ADA policy.  See Rohan Dep. II at 16, 26-27; see Exhibit 5 to Rohan Dep. II (Doc. 144-5, Exhibit 5; Rohan Dep. II, Ex. 5).   The policy divided accommodation requests into two categories: 1) requests for accommodations with respect to District-sponsored activities and 2) requests for accommodations with respect to non-District-sponsored activities.  See Rohan Dep. II, Ex. 5.  The Districts' attorney advised that if the activity is sponsored by the District, "then there is an obligation to provide accommodations to a person that is impaired subject to the primary considerations by the District of whether or not the request would place an undue hardship upon the District."  Id.  The attorney further advised that if the activity or event is not District-sponsored, "then the District is not required to accommodate the impaired person as it would be the responsibility of the entity or parties that are in charge of the event or activity."  Id.

_____

[22] Henry testified that Camp Villages is "an intergenerational day camp where grandparents and grandchildren participate in the activities together" and that it "[r]uns for eight weeks in the summertime."  Henry Dep. at 98.  This factual distinction is not material for purposes of summary judgment.

In 2010, Rohan and his staff recommended an amendment to the Resident Council Guidelines (now called the Resident Lifestyle Volunteer Guidelines) to include this policy formulated by the Districts' attorney. See Exhibit 3 to Tutt Dep. II at 11 (Doc. 144-3, Exhibit 3; Tutt Dep. II, Ex. 3); Tutt Dep. I at 74-75.  Presently, District policy is that the Recreation Department will provide accommodations, including a sign language interpreter if requested, to deaf residents for programs "sponsored" by the Districts or the Recreation Department. Rohan Dep. I at 54; Tutt Dep. II at 90; see supra at 13.  However, for RLG activities, the Districts will not provide accommodations, including sign language interpreters.  Id.[23]

In her affidavit, Tutt recognized that there may have been some confusion over when the Districts would provide interpreter services. Tutt Aff. ¶ 18.  For example, the Recreation Department has, in the past, sponsored pickle ball clinics and has provided interpreter services for these clinics, but the Recreation Department has not provided interpreter services for pickle ball events sponsored by the RLG pickle ball club.  Id.; see also Deposition of Bernard Brown at 101-103 (Doc. 131-10; Brown Dep.) (testifying that the Recreation Department provided an interpreter for two or three pickle ball clinic classes out of a total of four or five classes).  Tutt explained the distinction as follows: "The Districts have provided, and will continue to provide, sign language interpreters for all activities which they sponsor and for which such interpreter services have been requested.  Interpreters have not

---

[23] Nevertheless, the Districts, through the Recreation Department, provide auxiliary aid accommodations in the form of Portable Loop Systems for hard-of-hearing seniors to access the volunteer-led activities. Tutt Dep. II at 40. These Portable Loop Systems are also available for residents participating in the RLGs. Id. at 40-41. The Districts provide the Portable Loop Systems for residents using the Districts' facilities because, according to Tutt, this accommodation is an "ADA facility requirement" or "part of building code[.]" Id. at 41-43.

and will not be provided by the Districts for non-District club activities." Tutt Aff. ¶ 18.[24]  In

this Order, the Court addresses Plaintiffs' challenge to the Districts' refusal to provide sign

language interpreters for RLG activities.[25]

## B.    Standard of Review[26]

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to

be considered on a motion for summary judgment may include "depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those

made for purposes of the motion only), admissions, interrogatory answers, or other

materials."  Rule 56(c)(1)(A).[27]  An issue is genuine when the evidence is such that a

---

[24] In the Complaint, Plaintiffs allege that "[i]n October 2011, Louis Schwarz requested and was denied a sign language interpreter for the CDD play entitled "'Where Broadway Meets Gilbert and Sullivan.'" Complaint ¶ 133.  Plaintiffs allege that "[n]o response to the request was ever made to Mr. Schwarz's email." Id. ¶ 134. When asked in his deposition about this allegation, Schwarz testified that he assumed the play was "from the rec department or the entertainment department." Schwarz Dep. at 41.  Schwarz further testified that he does not know who the person was that he contacted because he just called a phone number listed in either the Recreation News or The Villages Daily Sun.  Id. at 41-42.
     McElwain testified that on one occasion, he complained to Rohan regarding the interpreters provided by the Recreation Department for a Christmas festival. McElwain Dep. at 24.  According to McElwain, the interpreters "weren't necessarily qualified interpreters" and were "inexpensive" and of "poor quality." Id.

[25] To the extent Plaintiffs alleged any failure to accommodate at a District-sponsored event, such allegations are addressed in a separate Order (Doc. 188).

[26] The Court applies an identical standard of review to Defendant, the Villages Charter School, Inc. d/b/a the Villages Lifelong Learning College's Motion for Summary Judgment and Memorandum of Law (Doc. 132).  As such, the Court will not repeat the standard of review with respect to its analysis of that Motion.

[27] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

     The standard for granting summary judgment remains unchanged.  The language of
     subdivision (a) continues to require that there be no genuine dispute as to any material fact and
                                                                                    (continued...)

reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing

---

[27](...continued)
   that the movant be entitled to judgment as a matter of law.  The amendments will not affect
   continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing

<u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

**C.    Analysis**

The Districts move for summary judgment as to Plaintiffs' claims in Count I (ADA),

Count III (FHA), and Count IV (Rehabilitation Act) on the grounds that the Districts have no

legal obligation to provide sign language interpreters for meetings or activities conducted by

the RLGs. <u>See</u> Motion at 39.

**1.    Plaintiffs' Objections to the Districts' Affidavits**

Before turning to the merits of the Motion, the Court will address Plaintiffs' argument

that the affidavits of the Districts' directors and employees are inadmissible as "sham

affidavits" which the Court "should strike altogether." Response at 20. Plaintiffs assert that

these affidavits are "wholly contradicted by the deposition transcripts of their affiants as well

as the documents the parties produced in discovery." <u>Id.</u>

> A court may determine that an affidavit is a sham when it contradicts previous
> deposition testimony and the party submitting the affidavit does not give any
> valid explanation for the contradiction. . . . . However, "[t]his rule is applied
> sparingly because of the harsh effect it may have on a party's case." . . . As
> such, courts must "find some inherent inconsistency between an affidavit and
> a deposition before disregarding the affidavit."

<u>Latimer v. Roaring Toyz, Inc.</u>, 601 F.3d 1224, 1237 (11th Cir. 2010) (citations omitted).

Indeed, "to allow every failure of memory or variation in a witness' testimony to be

disregarded as a sham would require far too much from lay witnesses and would deprive

the trier of fact of the traditional opportunity to determine which point in time and with which

words the . . . affiant . . . was stating the truth." <u>Allen v. Bd. of Public Educ. for Bibb Cnty.</u>,

-24-

495 F.3d 1306, 1316 (11th Cir. 2007) (quoting Tippens v. Celotex Corp., 805 F.2d 949, 953-54 (11th Cir. 1986)).

Plaintiffs do not specify which aspects of the affidavits are inherently contradicted by the affiants' depositions.  However, in Plaintiffs' introduction to their recitation of the facts, Plaintiffs assert that in their depositions, Rohan and Tutt "attempt to explain away hundreds of documents" which show that the RLGs are not private activities with no involvement by the Districts.  Response at 4 n.2.  Plaintiffs argue that "the reality is that the documents produced in discovery clearly and unambiguously contradict[ ]" Rohan's and Tutt's testimony.  Id.  However, the portion's of Rohan's and Tutt's depositions cited by Plaintiffs in this footnote reflect instances where Rohan and Tutt state that a document or communication should have been worded differently and where they explain the significance or reasoning behind the wording of a particular statement.  Thus, this deposition testimony does not reflect "inherent inconsistencies" with the affidavits.  If anything, these excerpts represent instances in which the deponents discuss the meaning behind the word choice in a document.  Additionally, to the extent there is any variation between the Districts' representatives' depositions and affidavits, these variations do not constitute inherent inconsistencies.  Moreover, the Background section of this Order fully sets forth the facts as represented in both the depositions and affidavits.  As such, the Court finds the contested affidavits admissible and will consider them in determining whether entry of summary judgment is appropriate.[28]

---

[28] Plaintiffs "demur, without admitting the materiality thereof, to the entire contents" of the Motion which set forth facts relating to each Plaintiff.  See Response at 18.  Also, Plaintiffs "object" to the Districts' "summary"
(continued...)

## 2.    Count I: ADA

In Count I of the Complaint, Plaintiffs allege that the Districts are public entities as defined under Title II of the ADA and that the Districts "violated Title II of the ADA in numerous ways[.]"  Complaint ¶¶ 339-340.  In particular, Plaintiffs allege that the Districts "[f]ailed to maintain policies and procedures to ensure compliance with Title II of the [ADA]"; "[f]ailed to ensure that communications with the Plaintiffs were [as] effective as communications with non-disabled persons"; and "[f]ailed to provide auxiliary aids and services, including a qualified interpreter, and modify policies and procedures to prevent discrimination against Plaintiffs and other persons with hearing disabilities with respect to" the RLG programs, as well as activities and events provided by the Districts.  Id. ¶ 340(a)-(g).  For this alleged discrimination, Plaintiffs seek a declaratory judgment, permanent injunctive relief, compensatory damages, and costs and attorneys' fees.  Id. at 44-45.  Thus, in the Complaint, Plaintiffs appear to allege that the Districts violated the ADA with respect to District-sponsored events and activities, as well as RLG activities.  However, because Plaintiffs' Response is limited to Plaintiffs' claim of discrimination with respect to the RLGs, see, e.g., Response at 1,[29] the Court similarly limits its analysis in this Order.

---

[28](...continued)
of Plaintiffs' depositions set forth on pages 38-39 of the Motion.  Id. at 18-19.  In the Background section of this Order, the Court has included excerpts of Plaintiffs' deposition testimony reflecting their impressions and beliefs regarding the RLGs.  However, Plaintiffs' testimony regarding the operations of the RLGs and the Districts' responsibility for accommodations with respect to the RLGs is not based on personal knowledge.  In the face of affirmative evidence in the form of documents and the affirmative testimony of witnesses's with personal knowledge, "statements of personal opinions, general beliefs and feelings, by their very nature, do not raise disputes of fact."  Green v. Miami-Dade Cnty., Case No. 02-22996, 2003 WL 22331877, at *6 (S.D. Fla. Sept. 9, 2003).

[29] The Court will cite the Response using the pagination which Plaintiffs have applied to the document rather than the pagination applied to the document by the Court's CM/ECF system.

Title II of the ADA provides that

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  To establish a claim of disability discrimination under Title II of the ADA, each Plaintiff must establish that (1) he or she is a qualified individual with a disability; (2) was denied the full and equal benefit of services, programs, or activities; (3) and that the denial was by a public entity.  See id.  Additionally, where, as here, a plaintiff alleges discrimination based on a public entity's refusal to provide a reasonable accommodation, the plaintiff must also establish that the plaintiff requested an accommodation (or the need for one was obvious) and that the public entity failed to provide a reasonable accommodation.  See McCullum v. Orlando Regional Healthcare, No. 6:11-cv-1387-Orl-31GJK, 2013 WL 1212860, at *4 (M.D. Fla. March 25, 2013); see also Smith v. Rainey, 747 F. Supp. 2d 1327, 1338 (M.D. Fla. 2010) ("In cases alleging a failure to make reasonable accommodations, the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation.").  Notably, Title II of the ADA governs only the actions of public entities, see Edison v. Douberly, 604 F.3d 1307, 1308 (11th Cir. 2010), and defines the term "public entity" as:

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority[.]

42 U.S.C. § 12131.

In the Motion, the Districts do not dispute that they are public entities or that Plaintiffs are qualified individuals with disabilities. See Motion at 4, 39 n.1. Instead, the Districts deny that they have an obligation to accommodate Plaintiffs with respect to RLG activities because: (1) participation in the RLGs is not a program, service or activity of the Districts; and (2) the RLGs are not instrumentalities of the Districts. Id. at 40. In the Complaint, Plaintiffs appear to allege that the Districts are the public entity at issue and that the RLG activities are the programs, activities, or services to which the Districts denied Plaintiffs access. See Complaint ¶¶ 339-340. Indeed, in the Response, Plaintiffs assert that "[t]he question is whether the [RLGs] are a service, program or activity of Defendants." Response at 21. However, Plaintiffs also cite the Department of Justice's Technical Assistance Manual ("TAM") addressing what constitutes a "public entity" under Title II of the ADA and argue that based on the TAM's stated definition, the RLGs are "covered by Title II[.]" Response at 22-23.[30] Whether the Districts are liable under Title II of the ADA for the RLGs' services, programs, and activities presents a legal issue to be decided by the Court. See Kerr v. Heather Gardens Assoc., Civil Action No. 09-cv-00409-MSK-MJW, 2010 WL 3791484, at *7 (D. Colo. Sept. 22, 2010). Accordingly, the Court will first address whether the activities of the RLGs are a service, program, or activity of the Districts under Title II of the ADA before turning to the question of whether the RLGs themselves are a public entity.

---

[30] Additionally, Plaintiffs argue that the TAM's guidance with respect to joint ventures between public entities covered by Title II and private entities covered by Title III is applicable to the instant action. Response at 23-24.

**i.    Whether the Districts are liable for the failure to accommodate at RLG functions**

"The ADA does not explicitly define 'services, programs, or activities.'" See Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 44 (2d Cir. 1997), recognized as superseded on other grounds, Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 171 n.7 (2d Cir. 2001).  However, the RA, which generally is to be interpreted in pari materia with the ADA, defines a "program or activity" as "all of the operations of . . . a local government."

Frame v. City of Arlington, 657 F.3d 215, 225 (5th Cir. 2011) (citing 29 U.S.C. § 794(b)(1)(A)).  Indeed, the Eleventh Circuit Court of Appeals has cited with approval the Second Circuit Court of Appeals' statement in Innovative Health Systems, Inc. that "the language of Title II's antidiscrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities' of [a public entity]" but that "it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context[.]'" Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist., 133 F.3d 816, 822 (11th Cir. 1998); see also Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1085-86 (11th Cir. 2007) (noting that the Eleventh Circuit "already has explained that the final clause of § 12132 'protects qualified individuals with a disability from being subjected to discrimination by any such entity, and is not tied directly to the services, programs, or activities of the public entity") (internal quotation marks omitted).  Notably, the DOJ regulations promulgated under

the ADA[31] support this broad reading of the statute.   Specifically, the regulations address

where a public entity is indirectly liable under Title II, providing that:

> A public entity, in providing any aid, benefit, or service, may not, directly or
> through contractual, licensing, or other arrangements, on the basis of disability
> . . . [d]eny a qualified individual with a disability the opportunity to participate
> in or benefit from the aid, benefit, or service[.]

28 C.F.R. § 35.130(b)(1)(I).  Further, the appendix to this section of the Regulations explains

that:

> [T]itle II applies to anything a public entity does. . . . All governmental activities
> of public entities are covered, even if they are carried out by contractors. For
> example, a State is obligated by [T]itle II to ensure that the services,
> programs, and activities of a State park inn operated under contract by a
> private entity are in compliance with [T]itle II's requirements.

28 C.F.R., Pt. 35, App. B.

   The Districts acknowledge this broad view of what constitutes a public program under

Title II.  See Motion at 40.  Nevertheless, in arguing that they are not liable under Title II for

any discrimination by the RLGs, the Districts analogize the relationship between the Districts

and the RLGs to various cases declining to impose liability on a public entity under Title II.

First, the Districts analogize the relationship between the Districts and the RLGs to a

"minimal licensing program" and cite a line of cases applying the following ADA regulation:

> A public entity may not administer a licensing or certification program in a
> manner that subjects qualified individuals with disabilities to discrimination on
> the basis of disability, nor may a public entity establish requirements for the
> programs or activities of licensees or certified entities that subject qualified
> individuals with disabilities to discrimination on the basis of disability. The

---

[31] "Because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, see 42 U.S.C. § 12134(a), the regulations 'must [be given] legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." Shotz v. Cates, 256 F.3d 1077, 1079 n.2 (11th Cir. 2001).

> programs or activities of entities that are licensed or certified by a public entity
> are not, themselves, covered by this part.

28 C.F.R. § 35.130(b)(6) (emphasis added); see Motion at 41-43.  The Districts cite Wendel

v. Fla. Dep't of Highway Safety & Motor Vehicles, 80 F. Supp. 3d 1297 (M.D. Fla. 2015),

arguing "that a public entity is not accountable for the alleged discriminatory practices of a

private company if those practices are not the result of requirements or policies established

by the public entity[.]"  Motion at 42.  Further, the Districts contend that "the Districts have

no policies prohibiting clubs from providing sign language interpreters to members."  Id.  In

Wendel, the plaintiff sued the Florida Department of Highway Safety and Motor Vehicles

("the DHSMV") for discrimination in violation of the ADA and RA related to a DUI school,

Sunshine Safety Council, Inc. ("Sunshine").  Wendel, 80 F. Supp. 3d at 1300.  The DHSMV

is responsible for licensing and regulating DUI schools pursuant to Florida law, and

Sunshine is one of twenty-six DHSMV-licensed DUI programs in the State of Florida.  Id.

In addressing the DHSMV's liability for Sunshine's alleged discrimination, the court reasoned

that "[a]ssuming that Sunshine did discriminate against Plaintiff because of his disability, any

such discrimination cannot be attributed to the [DHSMV]; rather, it is attributable to Sunshine

alone" because "[a] licensor is not accountable for any alleged discrimination of its licensee."

Id. at 1305.  The Court further stated that while the DHSMV "cannot administer a licensing

program in a manner that subjects persons with disabilities to discrimination, '[t]he programs

or activities of entities that are licensed or certified by a public entity are not, themselves,

covered' by"  28 C.F.R. § 35.130(b)(6).  Id.

The Districts also point the Court to Noel v. New York City Taxi & Limousine Comm'n, 687 F.3d 63 (2d Cir. 2012). In Noel, the plaintiffs brought suit against the New York City Taxi and Limousine Commission ("TLC") for allegedly failing to provide meaningful access to taxi services for persons with disabilities. Noel, 687 F.3d at 65. The Noel court likewise relied upon § 35.130(b)(6) and the relevant provisions of the TAM in determining that although the ADA's implementing regulations "prohibit[ ] the TLC from refusing to grant licenses to persons with disabilities who are otherwise qualified to own or operate a taxi . . .; [they] do[ ] not assist persons who are consumers of the licensees' product.'" Id. at 69. In doing so, the Court cited to the TAM, noting that a public entity is not accountable for discriminatory practices of a licensee "if those practices are not the result of requirements or policies established by" the public entity. Id. Additionally, in determining that "the TLC does not violate the ADA by licensing and regulating a private taxi industry that fails to afford meaningful access to passengers with disabilities[,]" the Noel court explained that "[t]he TLC's control over the taxi industry, however pervasive it is at this time, does not make the private taxi industry 'a program or activity of a public entity.'" Id. at 72; see also Tyler v. City of Manhattan, 849 F. Supp. 1429, 1441 (D. Kan. 1994) ("Although City programs operated under contractual or licensing arrangements may not discriminate against qualified individuals with disabilities, see 28 C.F.R. § 35.130(b)(6), '[t]he programs or activities of licensees or certified entities are not themselves programs or activities of the public entity merely by virtue of the license or certificate.'"); T.W. v. Jacobo, No. 4:13cv457-RH/CAS, 2014 WL 129056, at *1 (N.D. Fla. Jan. 13, 2014) (granting motion to dismiss an ADA claim brought by disabled plaintiffs against hospital-licensing public entity on the grounds that the

licensing entity cannot be liable for the action or inactions of the entity which operates the hospital).  The Districts argue that the fact that the Districts require RLG volunteers to "register and provide contact information . . . in the event the group wishes to use Districts facilities at no cost" is analogous to a "minimal licensing program."  Motion at 42.

However, one court has determined that a licensor should be held responsible for the licensee's failure to comply with the ADA despite § 35.103(6).  See Paxton v. State of West Va. Dep't of Tax & Revenue, 451 S.E.2d 779 (W.Va. 1994).  In Paxton, the West Virginia Supreme Court of Appeals affirmed a writ of mandamus compelling the West Virginia Lottery Commission to require all places selling lottery tickets to be accessible to persons with disabilities as a condition precedent to the issuance or renewal of their licenses.  Paxton, 451 S.E.2d at 780-81.  In finding the Lottery Commission liable under Title II, the Paxton court compared the facts of the case to those in Tyler:

> It is clear that the Lottery Commission offers more than a mere license to the entities which are given lottery outlets.  This is not like the liquor and building permits issued by the city in Tyler, where the city had no control over the premises and services.  Here, through its contract vendors the Lottery Commission furnishes the lottery devices and services that allow the licensee to conduct lottery sales.  The Lottery Commission is clearly a public entity within the meaning of the Americans with Disabilities Act, and it provides an aid, benefit or service on a continuing basis to its licensee.  Therefore, the Lottery Commission comes within the scope of 28 C.F.R. § 35.130(b)(1), which precludes a public entity that provides an aid, benefit, or service from allowing disability discrimination either through contractual, licensing, or other arrangements.

Id. at 784-85.  In reaching this conclusion, the court rejected the argument that "the [Lottery Commission] is only engaged in a licensing arrangement under 28 C.F.R. § 35.130(b)(6)" because, according to the court, "the Lottery Commission does more than merely license

lottery locations": "It controls and obtains substantial monies from the lottery system." Id. at 785.

Although factually unique, the relationship between the Districts and the RLGs is sufficiently analogous to that between a licensor and licensee such that § 35.130(b)(6) is instructive.   While the Districts do not literally license the RLGs, their role is, in some respects, akin to a minimal license.  For example, RLGs must be authorized by the Districts to use the Recreation Department facilities through the issuance of facility permits.  An RLG is permitted to use the recreation center rooms without paying a rental fee because only residents of The Villages, who pay the Amenities Fees which funds the recreation facilities, may be RLG volunteers and members.  In this way, the Districts' involvement with the RLGs amounts to a license to use recreation facilities at no cost.  The Districts are not involved in the content and presentation of RLG programs, activities, and events and receive no income from the events.  The Districts' involvement in the operations of the RLG programs is limited to facilitating the RLGs' use of the recreation centers as the forum for their programs, activities, and events, and ensuring compliance with facility guidelines applicable to all users of the recreation facilities.[32]  Thus, the relationship between the Districts and the RLGs

---

[32] With respect to the creation of RLGs, the evidence shows that the Districts play an active role in advertising the RLGs and in encouraging residents of The Villages to volunteer to create new RLGs.  See Tutt Aff. ¶ 11; Rohan Column ("Many Recreation Changes"); Rohan Column ("New year full of new possibilities"); Districts' Website Flyer.  Additionally, the Court recognizes that these documents use language like, "As we draw closer to the grand opening of Seabreeze, . . . staff is putting out the all-call to any resident who would love to volunteer by leading an activity for your fellow residents", "we are always trying to recruit residents to become part of our resident lifestyle volunteer team", and "We would love to have you on our team."  Rohan Column ("Many Recreation Changes"); Rohan Column ("New year full of new possibilities").  Plaintiffs argue that this language indicates that the RLG activities are part of the Districts' operations.  See Response at 4 & n.2. However, despite the Districts' use of this inclusive language in advertisements and newspaper columns, the evidence demonstrates that the RLGs are, in fact, operated independently by private individuals.

appears to be a closer analogue to those in <u>Wendel</u>, <u>Noel</u>, <u>Tyler</u>, and <u>T.W.</u>, and less analogous to <u>Paxton</u>.  Indeed, as the <u>Noel</u> court recognized that the pervasiveness of the TLC's "control" over the private taxi industry did not transform the industry into a program or activity of the TLC, the Districts' involvement in promoting and helping create the RLGs and in facilitating their meeting times and places does not make the programs and activities of the RLGs a program or activity of the Districts or the Recreation Department.  Further, <u>Paxton</u> is distinguishable because in that case the sole purpose of the Lottery Commission was to provide the lottery as a service from which it derived substantial income, whereas the Recreation Department provides numerous activities, events, and services for residents of The Villages, only one of which is to help facilitate the formation and meetings of the RLGs, over which the Districts exercise no control and from which the Districts derive no income.  <u>See</u> <u>Wendel</u>, 80 F. Supp. 3d at 1306 (distinguishing <u>Paxton</u> by stating that "[u]nlike the Lottery Commission, whose sole purpose is to conduct the lottery, the DHSMV provides a plethora of services, only one of which is to license the DUI programs to these private entities and then regulate and supervise the programs" and "[t]hese duties do not make the [DHSMV] responsible for Sunshine's allegedly discriminatory actions").[33]

---

[33] At oral argument, counsel for Plaintiffs asserted that "in some clubs over millions of dollars are provided by the [D]istricts so that these clubs can function."  By way of example, Plaintiffs' counsel referenced the woodshop club and asserted that "[t]he [D]istricts [have] provided a lot money for the equipment for the woodshop club. . . . [T]hey supply the wood, they supply the equipment, they supply millions of dollars so that club could function and work, without that support, that club would be either very different or not in existence without the support of the [D]istrict."  However, Plaintiffs were unable to point to evidence supporting these broad statements.  In her affidavit, Tutt testified

> The Woodshop is in a building owned by the Districts.  It is operated by Woodshop, Inc., a group which came with the building when its ownership was transferred from the Developer to the District some years ago.  The District has no interest in that corporation.  The tools and equipment in the shop are not owned by the District.

(continued...)

The Districts also analogize the relationship between the RLGs and the Districts  to property rentals by governmental entities to private groups.  Motion at 43.  The Districts cite Lang v. Or. Shakespeare Festival Ass'n, No. 1:12-cv-01844-CL., 2013 WL 5944184 (D. Or. Oct. 31, 2013), in which a disabled plaintiff sued the Oregon Shakespeare Festival Association ("OSF"), a private non-profit company which operates the Oregon Shakespeare Festival, and the City of Ashland, under Title II of the ADA on the grounds that certain OSF facilities were not accessible.  Lang, 2013 WL 5944184, at *1.  The City argued that the plaintiff's complaint was due to be dismissed because "the mere fact that it rents lands to OSF does not make it liable under Title II of the ADA for the conditions of the Festival's facilities."  Lang, 2013 WL 5944184, at *4.  The court agreed, stating that "the Festival as a whole is not a service, program, or activity of the City[.]"  Id.[34]

---

[33](...continued)
Tutt Aff. ¶ 23.e).  Additionally, in her deposition, Tutt testified that the Districts have a "contract with the woodshop club" and that

> they're required to provide - - they provide their equipment, their saws and blades, everything within the facility.  The building is provided, they provide their internal maintenance and operation within the building and they collect dues and they had an expansion and they actually took a loan from us, paid us interest and paid us back the loan for their, for the expansion to the facility. . . .
>      . . . [W]hen we purchased the amenities, that came over as a level of service, so it was in existence and the operation was all part of what we received.  We didn't buy facilities, we bought the amenity revenue stream or the blue sky and with that came the facilities and the rec, the woodshop came over in it's [sic] current existence is my understanding as to how that transpired. . . . The developer built it and . . . gave it to the district as part of the amenities and [sic] but there was a requirement on their part to do their share.

See Tutt Dep. I at 99-100.  Plaintiffs did not reference the woodshop club in the Response.  Moreover, the affirmative evidence cited above does not support an inference that the Districts provide "millions of dollars" to operate the woodshop club.

[34] However, the Lang court ultimately denied the City's motion to dismiss because some of the barriers identified by the plaintiff as being non-compliant with the ADA were the City's responsibility as public right of ways.  Lang, 2013 WL 5944184, at *4.

The Districts also cite <u>Haynes v. Wilder Corp. of De.</u>, 721 F. Supp. 2d 1218 (M.D. Fla. 2010), in which a wheelchair-bound, disabled plaintiff sued the owner/operator of a recreational vehicle resort, of which the plaintiff was a resident, under the FHA and Title III of the ADA.[35]  <u>Haynes</u>, 721 F. Supp. 2d at 1220.  In <u>Haynes</u>, residents of the RV resort which was owned and operated by the defendant formed a neighborhood association which planned social activities for the RV resort's residents.  <u>Id.</u> at 1221.  The plaintiff claimed that the defendant violated the ADA's prohibition on discrimination by public accommodations[36] by refusing to insure equal participation in neighborhood association activities taking place on the defendant's premises.  <u>Id.</u> at 1227.  The court found that the plaintiff's ADA claim failed because

> [a]lthough a landlord must comply with the public accommodation
> requirements of the ADA (and cannot avoid ADA compliance merely by

---

[35]  The Districts assert that it is appropriate for the Court to look to Title III for guidance in deciding Title II cases.  <u>See</u> Motion at 44 n.3.  Because the Court is able to reach its decision without reliance on Title III cases, the Court expresses no opinion on this assertion except to note that at least one court has looked to Title III in deciding a Title II case.  <u>See</u> <u>Celeste v. East Meadow Union Free School Dist.</u>, 373 F. App'x 85, 90-91 (2d Cir. 2010) (stating that although the plaintiff raises claims under Title II and the Rehabilitation Act, Title III may provide some guidance with respect to the language regarding "operat[ing]" a place of public accommodation).

[36] Title III's public accommodation provision provides that

> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C.A. § 12182(a).  42 U.S.C. § 12182(b)(2)(A)(ii) prohibits failing

> to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations[.]

42 U.S.C. § 12182(b)(2)(A)(ii).

leasing a public accommodation), the ADA does not require a landlord to ensure that a tenant (or a group of tenants) includes every neighbor at an event.    A landlord incurs liability only if the landlord implements a discriminatory policy, practice, or procedure. . . .

[T]he Neighborhood Association - an unincorporated group of neighbors informally responsible for planning "events" at Rice Creek - is not an agent for the defendant.  The defendant neither manages, nor organizes, nor supervises the events planned by the Neighborhood Association. . . . Neither the FHA nor the ADA requires a landlord to intervene in a purely private dispute among tenants.

Id. at 1228.  The Districts assert that these cases are instructive in the instant action given the importance of "facility usage" in the relationship between the RLGs and the Districts. Motion at 43.

Plaintiffs, however, contest the Districts' reliance on the licensing and landlord-tenant lines of cases.  Plaintiffs assert that in both Noel and Haynes, "the underlying activity had formed without the guidance, encouragement, or approval of the defendant."  Response at 24.  Plaintiffs also assert that "in none of the cases dealing with the government entity as either licensor or landlord did the governmental entity advertise and actively seek to create the entity in question" but that in the instant case "the record indicates that [t]he Districts advertised the [RLGs] as being part of the lifestyle offered by [t]he Districts, and solicited Volunteers to start and run such groups."  Id. at 24-25.  However, the court's decision in Haynes did not depend on the fact that the neighborhood association events formed without the guidance of the owner/operator of the RV resort.  Rather, the court's decision rested on the law relating to landlord liability under the ADA.  See Haynes, 721 F. Supp. 2d at 1228. Further, in Noel, the court declined to place any weight on the TLC's "control over the taxi

-38-

industry" in determining that the taxi industry was not a program or activity of a public entity. Noel, 687 F.3d at 72.

In addition to disputing the applicability of the Districts' cited cases, Plaintiffs assert that the instant action is more similar to Kerr, 2010 WL 379148. Indeed, the court's framing of the issue in Kerr appears almost identical to the issue in the instant action. See Kerr, 2010 WL 379148, at *7 (stating that "[t]he [ADA] does not expressly address whether a public entity that authorizes a third party to provide services, programs or activities at a venue owned by the public entity, remains responsible for compliance with the ADA"). The plaintiff in Kerr was a deaf individual who lived at Heather Gardens, a senior living facility. Id. at *1. She sued the Heather Gardens Metropolitan District ("HGMD"), the governing metropolitan district where Heather Gardens is located, and the Heather Gardens Association ("HGA"), the homeowner's association for Heather Gardens, for violations of the FHA and ADA. Id. at *1-*2. The HGMD and the HGA had entered into a Management Agreement which provided:

> WHEREAS, the [HGMD] and the [HGA] are desirous of entering into an Agreement whereby the [HGA] performs all of the duties of the [HGMD] except those duties required by law to be retained by the [HGMD] (e.g. preparation of budgets, levying of taxes, payment of debt, etc.) and to manage, operate, maintain, upgrade, rehabilitate, retire, replace and otherwise deal with the Properties.

Id. at *2. Additionally, the Management Agreement defined "the specific rights and duties of both the [HGMD] and the [HGA], including that the [HGA] make all operational decisions relating to the use of the [HGMD's] properties." Id. Further, the HGA was "the sole entity engaged in managing and operating Heather Gardens, including the community properties

-39-

owned by the [HGMD]" which included "conducting [HGA] board meetings and arranging for events such as lectures and other programs and the Community Center - the events from which [the plaintiff] allege[d] she was excluded." Id.

In seeking summary judgment as to the plaintiff's Title II claim, the HGMD argued that the plaintiff could not "demonstrate that [it] provided the services, programs, or activities" and that because "it delegated the provision of services, programs, and activities to the [HGA]," it "therefore, [was] not liable under Title II for the actions that the [HGA] t[ook] in performing these duties." Id. at *6. The court, however, rejected this argument, finding the language of 28 C.F.R. § 35.130(b)(1)(I) controlling in that the HGMD, as a public entity, was liable by virtue of its contract with the HGA "to manage and administer its public duties with the respect to Heather Gardens[.]" Id. at *9. The court further explained that the HGMD's liability did not hinge on any requirement that the public entity exercise "control" over the services, programs, or activities. Id. at *10. Rather, key to the court's analysis was that the HGMD had contracted with the HGA to conduct the board meetings and community events which were the HGMD's services, programs, or activities. Id. at *9 n.13, *10. As such, the court concluded that "a claim against the [HGMD] pursuant to Title II [was] actionable even though the [HGMD] delegated all of its authority and duties to the [HGA]." Id. at *11.

Plaintiffs assert that Kerr is analogous to the instant action because "the evidence demonstrates that [the Districts] ha[ve] tolerated others to provide services, at its encouragement, and subsequently delegated responsibility for accommodations, which the law prohibits it from doing." Response at 24. However Kerr does not stand for the proposition that simply tolerating the provision of services by others is enough to impose

liability under Title II.  Further, there is no evidence that the Districts have delegated their responsibility for "accommodations" to the RLGs.  The evidence reflects that it is the policy of the Districts to provide accommodations when requested at District-sponsored events. But the Districts also provide a forum for residents of The Villages to create clubs which, in turn, provide services, programs, and activities to other residents.  Thus, the circumstances of the instant case are distinguishable from the relationship between the HGMD and the HGA in <u>Kerr</u>.  In that case, the HGMD contractually delegated all responsibility for the operation of services, activities, and programs which the HGMD, otherwise, would have been responsible for itself.  No such relationship exists between the Districts and the RLGs. Here, the Districts, through the Recreation Department, offer their own services, programs, and activities for which they provide accommodations, but those are distinct from the activities of RLGs.

The Court agrees with Plaintiffs that the evidence reflects that the Districts, through the Recreation Department, seek out volunteers to establish new RLGs, help the volunteer leaders "advertise" the new RLGs to gauge interest, provide advertising of RLG events, and facilitate the formation of RLGs and their use of Recreation Department facilities.  As such, the Court recognizes that the facts of the instant action do not fit neatly into the ADA's regulatory provisions or the cited precedent.  However, the undisputed facts establish that while the Districts facilitate both the formation and operation of the RLGs, the RLGs programs, activities, and events are planned, controlled, and lead by private residents of The Villages, and actions taken on behalf of the RLGs are not actions of the Districts.

Plaintiffs also argue that "Federal Regulations do not impose liability only where the relationship is contractual or involves other direct action" in that the Districts "can also be liable for making 'other arrangements' to administer programs that have the effect of discriminating." Response at 27. According to Plaintiffs, "[b]y making the [RLG] [v]olunteers responsible for accommodating individuals with disabilities, Defendants have, through 'other arrangements,' utilized a method of administration that has the effect of discriminating against deaf individuals in violation of 28 C.F.R. § 35.130(b)(3)." Id. (emphasis in original). 28 C.F.R. § 35.130(b)(3) provides:

> (3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:
>
> > (I) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability [or]
> >
> > (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]

28 C.F.R. § 35.130(b)(3). This regulation prohibits discriminatory administration by a public entity. See Brantley v. Maxwell-Jolly, 656 F. Supp. 2d 1161, 1175-76 (N.D. Cal. 2009) (stating that 28 C.F.R. § 35.130(b)(3) "does not create rights that do not exist under the ADA" but that "it merely prohibits public entities from employing methods of administration which have the effect of discriminating against qualified disabled individuals on the basis of their disabilities"). Further, this "provision applies to written policies as well as actual practices, and is intended to prohibit both 'blatantly exclusionary policies or practices' as well as 'policies and practices that are neutral on their face, but deny individuals with disabilities

an effective opportunity to participate.'" <u>Cota v. Maxwell-Jolly</u>, 688 F. Supp. 2d 980, 995

(N.D. Cal. 2010).  Indeed, the Appendix to this regulation explains that this paragraph

> prohibits the public entity from utilizing criteria or methods of administration
> that deny individuals with disabilities access to the public entity's services,
> programs, and activities or that perpetuate the discrimination of another public
> entity, if both public entities are subject to common administrative control or
> are agencies of the same State.

28 C.F.R., Pt. 35, App. B.  Upon review, the Court is of the view that Plaintiffs' interpretation

of this regulation is too broad.  Liability under this regulation must still hinge on the fact that

the program, service or activity subject to the allegedly discriminatory "methods of

administration" is a program, service, or activity of the public entity.  Ultimately, the facts

establish that while the Districts facilitate the formation and logistical functions of RLG

programs and activities, the RLG programs and activities are distinct from those offered by

the Districts themselves.  As such, the Districts cannot be held liable for the RLG's alleged

failures to accommodate with respect to the RLG programs, activities, and events.

### ii.      Whether the RLGs are instrumentalities of the Districts

Having determined that participation in the RLGs is not a program, service, or activity

of the Districts, the Court next turns to the question of whether the RLGs themselves are

public entities under Title II of the ADA.  In the Motion, the Districts argue that [u]nder Title

II of the ADA, to become an instrumentality of a State, the entity must be a governmental

entity or be a unit created by them."  Motion at 40 (citing <u>Edison</u>, 604 F.3d at 1310).  The

Districts correctly identify the controlling definition in the Eleventh Circuit with respect to what

constitutes an "instrumentality of a State" under Title II.  In light of this definition, the Districts

assert that the RLGs are private entities - not governmental units and not created by the

government.  Id.  In opposition, Plaintiffs rely on the DOJ's TAM, which offers guidance regarding what constitutes a public entity, and assert that the RLGs are "covered by Title II." Response at 23.

The regulations issued by the DOJ restate the definition of public entity found in the statute.  See 28 C.F.R. § 36.104; see also Melton v. Orange Cnty. Democratic Party, 304 F. Supp. 2d 785, 787 (M.D.N.C.).  However, the DOJ has issued the TAM pursuant to 42 U.S.C. § 12206(c) which provides a more detailed explanation.  See Melton, 304 F. Supp. 2d at 787.  Like the ADA regulations, the agency's interpretations in the TAM are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. See Bragdon v. Abbott, 524 U.S. 624, 646 (1998) (granting Chevron[37] deference to the DOJ's TAM regarding Title III of the ADA).

The TAM states that, as a general rule, "Title II is intended to apply to all programs, activities, and services provided or operated by State and local governments."  The American with Disabilities Act: Title II Technical Assistance Manual II-1.2000 (Nov. 1993) (http://www.ada.gov/taman2.html).  The TAM further explains:

> In some cases it is difficult to determine whether a particular entity that is providing a public service, such as a library, museum, or volunteer fire department, is in fact a public entity. Where an entity appears to have both public and private features, it is necessary to examine the relationship between the entity and the governmental unit to determine whether the entity is public or private. Factors to be considered in this determination include --
>
> 1) Whether the entity is operated with public funds;
>
> 2) Whether the entity's employees are considered government employees;

---

[37] Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 844 (1984).

> 3) Whether the entity receives significant assistance from the government by provision of property or equipment; and
>
> 4) Whether the entity is governed by an independent board selected by members of a private organization or a board elected by the voters or appointed by elected officials.

Id. Plaintiffs argue that "application of these factors leads to the conclusion that the [RLGs] are covered by Title II."  Response at 23.  The Court disagrees.

With respect to the first factor, Plaintiffs assert that "[t]he [RLGs] are operated by [A]menities [F]ees that are charged to each resident, which operate just like taxes[.]" Id. However, the RLGs are not operated by Amenities Fees - the Recreation Department facilities, which the RLGs use, and the Recreation News, in which the RLGs are permitted to advertise their meetings, are funded by the Amenities Fees.  Henry Dep. at 21-22; Tutt Dep. I at 49.  But the functions and operations of the RLGs receive no funding from Amenities Fees.  Thus, this factor weighs against a finding that the RLGs are public entities. With regard to the second factor, Plaintiffs argue that "[t]he [RLGs'] employees, for purposes of this analysis, are the [RLG volunteers], who operate at [the Districts'] pleasure and are subject to [the Districts'] guidelines and hiring process."  Response at 23.  However, the record does not support the conclusion that the RLG volunteers are "employees" of the Districts, so this factor weighs against a finding that the RLGs are public entities.  As to the third factor, Plaintiffs argue that "[t]he [RLGs] receive government assistance in the form of [A]menities [F]ees[.]"  Id.  The Districts do indeed provide assistance to the RLGs by allowing them to use the Recreation Department facilities without paying rental fees by virtue of RLG members' payment of Amenities Fees.  Thus, this factor weighs in favor of finding

-45-

that the RLGs operate as public entities.  Finally, with regard to the fourth factor, Plaintiffs argue that "[t]he [RLGs] in question are created through an application and appointment process undertaken by the Districts, which are public entities."  Id.  However, the Court struggles to see how this factor applies to the RLGs at all.  The RLGs are not "governed" by any entity.  The Districts do offer assistance in helping residents create RLGs, but once established, the record establishes that the Districts do not interfere with the governance or management of RLGs other than to help facilitate their use of the Recreation Department facilities and ensure that in doing so they are in compliance with Recreation Department rules.  Thus, the fourth factor weighs against a finding that the RLGs operate as public entities.  In consideration of the record, the Court is of the view that, on balance, applying the TAM's guidance, the RLGs are not public entities.

Next, Plaintiffs assert that "[t]o the extent that [t]he Districts are a public entity and the [RLG] [v]olunteers are private parties," the TAM's guidance relating to a joint venture between a public entity covered under Title II of the ADA and private party covered under Title III indicate that "both [entities] are responsible for ADA compliance."  Response at 23-24 (emphasis in original).  The relevant section of the TAM provides:

> **II-1.3000 Relationship to title III.**  Public entities are not subject to title III of the ADA, which covers only private entities. Conversely, private entities are not subject to title II. In many situations, however, public entities have a close relationship to private entities that are covered by title III, with the result that certain activities may be at least indirectly affected by both titles.

The Americans with Disabilities Act: Title II Technical Assistance Manual II-1.3000.  The TAM provides four illustrations of this provision, one of which Plaintiff cites in the Response, see Response at 23:

> ILLUSTRATION 3: A city engages in a joint venture with a private corporation to build a new professional sports stadium. Where public and private entities act jointly, the public entity must ensure that the relevant requirements of title II are met; and the private entity must ensure compliance with title III. Consequently, the new stadium would have to be built in compliance with the accessibility guidelines of both titles II and III. In cases where the standards differ, the stadium would have to meet the standard that provides the highest degree of access to individuals with disabilities.

The Americans with Disabilities Act: Title II Technical Assistance Manual II-1.3000.  Plaintiffs argue that

> [t]he facts of this case fit this example of a 'joint venture' between a public entity and a private party.  The evidence of record supports this analysis because [t]he Districts actively promote and advertise the Groups, and the Groups would not exist without intervention by [t]he Districts.

Response at 23.  This argument misapprehends section II-1.3000 of the TAM.  The basis for Title II liability under this section hinges on circumstances where the public entity subject to Title II (here, the Districts) engages in either a contractual relationship or joint endeavor with an entity subject to Title III of the ADA, which governs public accommodations. Plaintiffs have neither alleged nor offered any factual or legal basis to support a conclusion that the RLGs are public accommodations subject to Title III.

In light of the foregoing, the undersigned concludes that the Districts are not liable for the alleged discrimination of the RLGs because the RLGs are not programs, services, or activities of the Districts and because the RLGs are not instrumentalities of the Districts under Title II.  As such, there are no genuine issues of material fact with respect to Plaintiffs' ADA claim against the Districts based on the failure to provide accommodations for activities of the RLGs, and as to that claim in Count I, summary judgment is due to be entered in favor of the Districts.

### 3.    Count IV: RA

Section 504 of the RA states, in the pertinent part, that:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

29 U.S.C. § 794(a).  The statute defines the term "program or activity" as including all of the

operations of—

**(1)(A)** a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

**(B)** the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . . any part of which is extended Federal financial assistance.

Id. § 794(b).

In Count IV of the Complaint, Plaintiffs allege a claim against the Districts under the

RA.  See Complaint ¶¶ 370-379.  Plaintiffs contend that they are qualified persons as

required by the RA and that the Districts are a "special purpose district or local government

that receives federal funding and is [sic] required to comply with the mandates under Section

504 of the [RA]."  Id. ¶¶ 372, 373.  Plaintiffs further assert that "[t]he [Districts'] programs,

services and activities including" the RLGs and other amenities offered by the Districts "are

covered programs or activities under the [RA]."  Id. ¶ 374.  In support of their RA claim,

Plaintiffs allege the same facts as they assert in their ADA claim.  Id. ¶ 375.

The Districts move for summary judgment as to Count IV, arguing that "[w]ith the

exception of its federal funding requirement, the RA uses the same standards as the ADA,

and therefore, cases interpreting either are applicable and interchangeable." Motion at 51. As such, the Districts argue that Plaintiffs' ADA claim fails for the same reasons Plaintiffs' RA claim fails.[38]  The Court agrees.

"With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable." Badillo v. Thorpe, 158 F. App'x 208, 214 (11th Cir. 2005) (citing Cash v. Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000)); see also Wendel, 80 F. Supp. 3d at 1304-05 (holding that the licensor public entity Florida Department of Highway Safety and Motor Vehicles "is not responsible for a violation that it did not directly carry out" and that "this analysis is equally applicable to the RA and [Title II] ADA claims, which both require a showing of discrimination on behalf of the" public entity); Haddad v. Arnold, 784 F. Supp. 2d 1284 (M.D. Fla. 2010) (noting that "Plaintiff's Rehab Act claim is essentially the same as her [Title II] ADA claim, and discrimination claims of this kind are analyzed similarly under the two acts" thus, "the Court will refer primarily to the ADA for the sake of brevity").  Thus, because the Court has concluded that the Districts are not liable under Title II of the ADA for the alleged discrimination in the provision of programs, services, and activities by the RLGs, the Districts are similarly not liable under the RA.  As such, there are no genuine issues of material fact with respect to Plaintiffs' RA claim against the Districts as to the activities of the RLGs, and as to that claim in Count IV, summary judgment is due to be entered in favor of the Districts.

---

[38] Additionally, the Districts argue that because the Districts are not recipients of federal funds, this provides another basis for dismissal of Plaintiffs' RA claim.  Motion at 51.  However, the Court need not reach this argument for the reasons set forth in the body of this Order.

### 4.    Count III: FHA

In Count III of the Complaint, Plaintiffs allege a claim under the FHA against the Districts.  See Complaint ¶¶ 356-369.  Plaintiffs assert that the Districts are "a municipal organization required to comply with the mandates under 42 U.S.C. § 3604 of the FHA." Id. ¶ 358.  Further, Plaintiffs contend that they are disabled and that they are homeowners in The Villages and, as such, are qualified persons under the FHA. Id. ¶ 359.  Plaintiffs further allege that they own homes or are renters of homes that are dwellings as defined by the FHA and that "[t]he amenities are services connected to each home and are subject to 42 U.S.C. § 3604 of the FHA."  Id. ¶¶ 360-361.  Plaintiffs point to the same discriminatory actions as violating the FHA as they do in their claims under the ADA and RA.  See id. ¶ 362.

The FHA provides that

it shall be unlawful . . . [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of - -

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1).  The FHA makes it unlawful also

[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of - -

(A) that person; or

> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that person.

Id. § 3604(f)(2). Discrimination under this section of the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." Id. §3604(f)(3)(B); see also Bhogaita v. Altamonte Heights Condominium Ass'n, Inc., 765 F.3d 1277, 1285 (11th Cir. 2014) ("The FHA prohibits discriminating against a person on the basis of a 'handicap,' or a disability, by refusing to make reasonable accommodations when necessary to afford the person equal opportunity to use and enjoy a dwelling."). Further, HUD has promulgated a regulation which defines a "dwelling unit" to include "public and common use areas."[39] See 24 C.F.R. § 100.204(a).[40] A different HUD regulation defines "Discrimination in terms, conditions and privileges and in services and facilities" and provides that "[p]rohibited actions" include "[l]imiting the use of privileges,

[39] The FHA defines "Dwelling" to mean

> any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

42 U.S.C.A. § 3602(b).

[40] This regulation provides in full:

> It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

24 C.F.R. § 100.204(a).

services, or facilities <u>associated with a dwelling</u> because of . . . handicap . . . of an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4) (emphasis added).

In seeking summary judgment as to Plaintiffs' FHA claim, the Districts argue that "[t]he Plaintiffs have not, and cannot, assert that sign language interpreters are a necessary accommodation for their use and enjoyment of their dwelling unit" and that "[l]ikewise, they cannot contend that interpreters are needed so that they may use public and common areas." Motion at 47. The Districts note that under 24 C.F.R. § 100.204, accommodations are required to be provided so that a handicapped person can use a "dwelling unit" or "public and common use areas." <u>Id.</u> at 48. However, the Districts maintain that this regulation "cannot be read to impose an obligation on the seller or landlord of property to provide accommodations to the handicapped buyer or lessee so that person can attend club meetings held at their own dwellings" or "at the seller or landlord's common areas or facilities." <u>Id.</u> Instead, the Districts assert that "[t]he regulation is clear that under the FHA[,] accommodations are necessary only for the use of the property, not for activities that might be engaged in on that property." <u>Id.</u> Accordingly, the Districts dispute what they assert is Plaintiffs' argument that participation in the RLGs is an amenity and amenities are services connected to each home. <u>Id.</u> Additionally, while acknowledging that 24 C.F.R. § 100.65(b)(4) provides that prohibited actions under the FHA include "limiting the use of privileges, services or facilities associated with a dwelling because of . . . handicap," the Districts assert that participation in a RLG is not a service under the FHA, nor are the RLGs associated with the dwelling. <u>Id.</u> The Districts contend that the Amenities Fees charged to each residential unit entitles the homeowner to use of the recreational facilities but that the

Court should not treat the RLGs as if they are facilities.  Id. at 49.  Further, the Districts maintain that even if one were to assume that participation in the RLGs is a "service", participation in the RLGs is in no way connected to the Plaintiffs' residences.  Id.  Last, the Districts contend that the FHA is inapplicable to post-sale activity.  See id. at 50 n.8.

In opposition to the Motion, Plaintiffs argue that the RLGs "are both a service and a privilege of living at The Villages, as they are open to all residents (but only residents) by virtue of payment of the [a]menities [f]ees."  Response at 33.  Plaintiffs, thus, contend that the RLGs are "privileges or services associated with Plaintiffs' dwellings, offered by [the Districts], [and] over which [the Districts] retain the right and power to control."  Id. at 35.

As previously stated on the record at the September 9, 2014 Hearing, see Clerk's Minutes (Doc. 115), the Eleventh Circuit has, in at least in two cases, decided post-sale failure to accommodate claims under the FHA.  See Bhogaita, 765 F.3d at 1281 (11th Cir. 2014); see also Hawn v. Shoreline Towers Phase 1 Condominium Ass'n, Inc., 347 F. App'x 464, 465 (11th Cir. 2009).  Thus, the Court rejects the Districts' argument seeking summary judgment on the basis that post-sale activities are not covered by the FHA.

However, whether Plaintiffs can establish the elements of a failure-to-accommodate claim presents a closer question.

> A successful failure-to-accommodate claim has four elements.  To prevail, one must prove that (1) he is disabled within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) the requested accommodation was necessary to afford him an opportunity to use and enjoy his dwellings, and (4) the defendants refused to make the accommodation.

Bhogaita, 765 F.3d at 1285 (citing Schwarz v. City of Treasure Island, 544 F.3d 1201, 1218-19 (11th Cir. 2008)).  Plaintiffs' failure to accommodate claim turns on whether the Districts

have refused to make an accommodation necessary to afford Plaintiffs an opportunity to use and enjoy services and facilities associated with their dwellings, which include public and common areas.   Relevant to this question, at least two district courts in this circuit have recognized the distinction under the FHA between purchasing a standalone dwelling and purchasing a dwelling in a planned development whereby the homeowner becomes subject to the homeowner's association rules and restrictions, and is, in turn, entitled to the provision of services associated with home ownership.  See Savanna Club Worship Serv., Inc. v. Savanna Club Homeowners' Ass'n, Inc., 456 F. Supp. 2d 1223, 1230 (S.D. Fla. 2005); Smith v. Zacco, No. 5:10-cv-360-TJC-JRK, 2011 WL 12450317, at *6 (M.D. Fla. March 8, 2011).

In Savanna Club, the plaintiffs had historically conducted religious services in a planned community's club house or common areas until the planned community's homeowner's association adopted a rule disallowing anyone from conducting religious services in any of the club houses or common areas.  Id. at 1224.  In addressing the plaintiffs' claim that this rule violated the FHA as discrimination based upon religion, the court noted that "[t]he FHA does not define, and the Eleventh Circuit has not addressed, the issue of what constitutes 'discrimination . . . in the provision of services.'" Id. at 1227-28. The court first rejected the defendant's argument that the FHA "was geared at preventing discrimination in the context of sale or acquisition of housing only" and that the FHA does not reach "post-acquisition discrimination."  Id. at 1228-29.  Indeed, the court stated that such an "interpretation certainly cannot apply to unique planned communities" such as the one at issue in that case because cases declining to apply the FHA to post-sale discrimination "did not directly address the provision of services as they relate to planned

communities where some types of services are in fact part and parcel with home ownership." Id. at 1229.  Relying upon the Florida Homeowner's Association Act, the court determined that "part and parcel of the purchase of a home within a planned community are the rights and privileges associated with membership within the community" and that "[i]t would appear, therefore, that in the context of planned communities, where association members have rights to use designated common areas as an incident of their ownership, discriminatory conduct which deprives them of exercising those rights would be actionable under the FHA." Id. at 1230.  Also relevant to the court's analysis was the HUD regulation's use of the term "associated with a dwelling" and not the phrase "related to the sale thereof", finding that "[t]his distinction makes sense given the unique nature of planned community home ownership." Id.  Thus, the court stated that "if an association member was completely denied access to a clubhouse or other common area because they were Jewish or of another religion, such denial would clearly be a deprivation of full use of the incidents of ownership under the FHA." Id.  The court, however, determined that the plaintiffs' claims must fail because the plaintiffs had not established that "based on religion, [they were] denied provision of services protected by the FHA which were available to other homeowners." Id. at 1232.  Indeed, the court stated that "[n]one of the Club's homeowners have been denied access to Savanna's common areas.  Rather, they have been denied permission to use the common areas to conduct their religious services." Id.  As such, the Court determined "that the FHA only applies to those deprivations in the provision of services which cause a complete denial of access to such services." Id.

In applying Savanna Club's reasoning to the instant case, the Court will assume for purposes of this discussion that use of the Recreation Department facilities is a "part and parcel of the purchase a home" within The Villages. In Savanna Club, the homeowner's association rule did not prevent individuals affiliated with certain religions from accessing designated common areas.  Rather, these individuals were prevented from conducting religious activities in these common areas.  Similarly, the deaf residents of The Villages are not denied access to Recreation Department facilities.  Rather, the Recreation Department, through the Districts, has declined to offer sign language interpreters for events hosted by the RLGs at the Recreation Department facilities.  The record demonstrates that access to the Recreation Department facilities is the type of "use of privileges, services, or facilities associated with a dwelling" which the FHA is intended to cover because the Amenities Fees paid by homeowners in The Villages are used to operate these facilities.  And while the Districts limit participation in the RLGs to residents of The Villages and limited guests because RLGs meet at Recreation Department facilities, the RLGs are not - for all of the reasons discussed above regarding Plaintiffs' ADA claim - a service of the Districts for purposes of the FHA.  Thus, Plaintiffs' theory of liability it too attenuated to be actionable, particularly in light of the FHA's policy as being intended to provide access to housing.  As such, the Districts are not liable under the FHA for the alleged discrimination by the RLGs.  Because there are no genuine issues of material fact with respect to Plaintiffs' FHA claim against the Districts, summary judgment is due to be entered in favor of the Districts as to Count III.

**II.    Defendant, The Villages Charter School, Inc. d/b/a The Villages Lifelong Learning College's Motion for Summary Judgment and Memorandum of Law (Doc. 132)**

> **A.    Background**
>
>> **1.    The Villages Charter School, Inc., and the Villages Charter Schools**

The Villages Charter School, Inc. (the "Charter School Corporation"), is a private, domestic, not for profit corporation incorporated in Florida in 1999.   Affidavit of Randy McDaniel ¶ 3 (Doc. 133; McDaniel Aff.).   The Charter School Corporation operates three charter schools, an elementary school, middle school, and high school (hereinafter, the "Villages Charter Schools"), under a contract, or charter, with the Sumter County District School Board ("Sumter County"), which acts as the sponsoring school district of the Villages Charter Schools.   See id. ¶ 2; Independent Audit Records 2012-2014 at 63 (Doc. 142-16; Independent Audit Records 2012-2014); see also FLA. STAT. section 1002.33(5)(a)1.   The Charter School Corporation operates the Villages Charter Schools as "charter schools-in-the-workplace" pursuant to Florida Statutes section 1002.33(15).   McDaniel Aff. ¶ 4.   As charter schools in the workplace, the children of employees of the developer of The Villages, The Villages of Lake Sumter, Inc., may attend the Villages Charter Schools.   Id. ¶ 6.   Under Florida law, the charter must include "[t]he governance structure of the school, including the status of the charter school as a public or private employer as required in paragraph 12(l)."[41]

---

[41] FLA. STAT. § 1002.33(i) provides:

A charter school shall organize as, or be operated by, a nonprofit organization. A charter school may be operated by a municipality or other public entity as provided for by law. As such, the charter school may be either a private or a public employer. As a public employer, a charter

(continued...)

FLA. STAT. § 1002.33(7)(a)15.  As such, the Villages Charter Schools are organized as "private employers" as defined in Florida Statutes section 1002.33, and, accordingly, "employees of the [Charter School Corporation] do not participate in the Florida Retirement System."  McDaniel Aff. ¶ 8.

The Charter School Corporation is audited every year by a private auditor, and the audit results are then filed with the State of Florida.  See Deposition of Randy McDaniel at 54 (Doc. 142-2; McDaniel Dep.); see generally Independent Audit Records 2012-2014; Independent Audit Records 2008-2012 (Doc. 142-15; Independent Audit Records 2008-2012).  Additionally, as a school district board, Sumter County is audited by the State of Florida.  McDaniel Dep. at 54.  Because the Villages Charter Schools are a "component unit" of Sumter County, the Villages Charter Schools' financial reports are required to be included in Sumter County's Annual Financial Report.  See FLA. STAT. § 1002.33(9)(g)2. ("Charter schools shall provide annual financial report and program cost report information in the state-required formats for inclusion in district reporting in compliance with s. 1011.60(1)[42].").

---

[41](...continued)
school may participate in the Florida Retirement System upon application and approval as a "covered group" under s. 121.021(34). If a charter school participates in the Florida Retirement System, the charter school employees shall be compulsory members of the Florida Retirement System. As either a private or a public employer, a charter school may contract for services with an individual or group of individuals who are organized as a partnership or a cooperative. Individuals or groups of individuals who contract their services to the charter school are not public employees.

FLA. STAT. § 1002.33(12)(i).

[42] This provision of the Florida code provides:

Each district which participates in the state appropriations for the Florida Education Finance Program shall provide evidence of its effort to maintain an adequate school program throughout the district and shall meet at least the following requirements:

(continued...)

The Holding Company of The Villages, Inc. (the "Holding Company") provides operating funds for the Villages Charter Schools. McDaniel Dep. at 55-56; see also Affidavit of Gina Ritch ¶ 9 (Doc. 134; Ritch Aff.) ("All such contributions from The Villages Holding Company have been used to supplement the K-12 operations of the charter school[.]"). However, there is some ambiguity in the record with respect to whether the Holding Company provides these operating funds to the Charter School Corporation or directly to the Villages Charter Schools. The Charter School Corporation's Independent Audit Records state that "[t]he Villages Charter School, Inc. is a charter school in the workplace and is subsidized by the Holding Company of The Villages, Inc. (The Villages).[43] The Villages makes contributions to the Charter School to supplement its operations as needed." See Independent Audit Records 2012-2014 at 22, 52. Thus, the Independent Audit Records do not appear to distinguish between the Charter School Corporation and the Villages Charter Schools as separate entities. According to the Charter School Corporation's Director of Education, Randy McDaniel, due to a deficit in the Charter Schools Corporation's budget,

---

42(...continued)

> **(1) Accounts and reports. --** Maintain adequate and accurate records, including a system of internal accounts for individual schools, and file with the Department of Education, in correct and proper form on or before the date due as fixed by law or rule, each annual or periodic report that is required by rules of the State Board of Education.

FLA. STAT. § 1011.60(1).

43 In the Independent Audit Records, the private auditors define "the Holding Company of The Villages, Inc." as "The Villages." See, e.g., Independent Audit Records 2012-2014 at 22. In their affidavits, representatives for the Charter School Corporation reference "The Villages Holding Company" as well as "the Holding Company of [T]he Villages Inc." See Affidavit of Gina Ritch ¶ 9 (Doc. 134; Ritch Aff.); Affidavit of Gary Lester ¶ 2 (Doc. 136; Lester Aff.). The Court will continue to refer to the Holding Company of The Villages, Inc., as the "Holding Company."

the "developer"[44] makes up that deficit by providing operating funds for the Villages Charter

Schools to the Charter School Corporation. McDaniel Dep. at 55-56. However, John Wise,

the Vice President and CFO of the Holding Company and a member of the Board of

Directors of the Charter School Corporation, testified that "[t]he Holding Company of [T]he

Villages has provided advances to the Villages Charter School over the last few years to

address a timing issue with respect to the receipt of funds from Sumter County." Affidavit

of John Wise ¶ 6 (Doc. 135; Wise Aff.).[45] As set forth in the Analysis portion of this Order,

because the evidence establishes that the Holding Company's funds are used for the

---

[44] There appears to be some ambiguity in the record regarding whether it is the Holding Company of The Villages or the developer of The Villages, The Villages of Lake Sumter, Inc., which provides operating funds to the Charter School Corporation. For example, the Director of Accounting for the Charter School Corporation, Gina Ritch, see Ritch Aff. ¶ 2, testified that "the developer gives the "[C]harter [S]chool, [I]nc., money to cure any debts or deficits every year[.]" See Deposition of Gina Ritch at 16 (Doc. 142-6; Ritch Dep.). She then explained, "Our corporate sponsor does contribute to the charter school to help support its operations as needed." Id. Additionally, when asked whether "the holding company of The Villages, is The Villages of Lake Sumter, Inc., or . . . some other entity", Ritch testified, "I'm not totally familiar with the structure, but I believe The Villages Lake Sumter, Inc., I think is a part of the holding company of The Villages. . . . I'm not sure if it's a subsidiary or if it's just a department or I'm not sure." Ritch Dep. at 30. However, as discussed in the body of this Order, whether the Holding Company or The Villages' developer provides these operating funds is not material for purposes of resolution of the Motion. Further, because the Charter School Corporation's representatives appear to reference the Holding Company of The Villages and The Villages of Lake Sumter, Inc., interchangeably, for the sake of clarity, the Court will refer to the entity which provides operating funds as "the Holding Company."

[45] There is also some additional ambiguity in the record with regard to whether the Holding Company provides "advances" or "contributions." For example, Wise testified in his deposition that the Holding Company provides "advances" and that "[t]here is an obligation to pay back these advances if money becomes available to the charter school." Deposition of John Wise at 8 (Doc. 142-1; Wise Dep.). However, Wise further testified that he was not aware of any agreement between the Holding Company and the Charter School Corporation requiring the Charter School Corporation to pay the funds back to the Holding Company should funds become available. Id. at 8-9. He also testified that he does not "think anybody believes that all of the funds advanced will be paid back any time in the future" and that he believes the Charter School Corporation "books" the Holding Company funds "initially as an advance and then if they need that money, it becomes a contribution." Id. at 11-12. Ritch testified that the funds from the Holding Company are contributions which are recognized as revenue, so the funds are not loans, and there is no obligation for the Charter School Corporation to pay them back, see Ritch Dep. at 21-23. As set forth in the body of this Order, the issue of whether the funds provided by the Holding Company are contributions or advances is not material for purposes of summary judgment.

operations of the Villages Charter Schools and not the Lifelong Learning College, this ambiguity in the record is not material for purposes of summary judgment.

### 2.    The Lifelong Learning College

In addition to the three charter schools, the Charter School Corporation also operates three "fee-based" programs - an early childhood development program, an after-school program, and a lifelong learning program, The Villages Lifelong Learning College ("LLC"). Ritch Dep. at 7; McDaniel Aff. ¶ 9; see also Independent Audit Records 2012-2014 at 63. The Villages Lifelong Learning College is a fictitious name owned by the Charter School Corporation, McDaniel Aff. ¶ 9, and neither the early childhood development program nor the LLC are included in the charter between Sumter County and the Charter School Corporation.  Independent Audit Records 2012-2014 at 63.

The LLC offers a personal enrichment curriculum for adults living in The Villages and surrounding areas.  McDaniel Aff. ¶ 9.  It offers between 450 and 500 courses per semester in each of two semesters and also offers a speaker series which includes 1-2 speakers per month on varying topics.  Id. ¶ 11.  The enrichment classes are all non-credit courses and cover topics including cooking, photography, yoga, making clay pots, art, and interior design. Affidavit of Michelle Shideler ¶ 5 (Doc. 137; Shideler Aff.).  To register for a class, an applicant must complete a registration form and include payment for the course.  McDaniel Aff. ¶ 12.  Course fees range from $5.00-$90.00 per course which covers the instructor fee, room rent, and administrative costs.  Id.  Most courses last between six and eight weeks. Id.

The LLC operates separate from the Villages Charter Schools with its own staff, operations, budget and bank accounts. McDaniel Aff. ¶ 10. Indeed, the LLC is "financially self-sustaining" in that its operating income is derived solely from registration and class fees. Id. ¶ 13; see also Ritch Aff. ¶ 4 ("[A]ll expenses of The Villages Lifelong Learning College are paid from registration and related fees received from adult students attending The Village Lifelong Learning College."). Thus, the LLC does not receive any funds from the Charter School Corporation. McDaniel Aff. ¶ 14. Additionally, employees of the LLC are paid from funds generated by the LLC's operations and not from funds received from any government source for the Villages Charter Schools' operations. Id. ¶ 10. The LLC conducts most of its classes at the Villages Charter Schools and pays for its use of those facilities from course fees. Id. ¶ 14. As such, course fees are set in advance of the course offering to compensate instructors and pay rent and overhead associated with operating the LLC. Ritch Aff. ¶ 5. The LLC does not generate a profit for the Charter School Corporation, but it does cover its own costs and overhead. Id.

The revenue and expenses of the LLC are included on the financial statements and Independent Audit Records of the Charter School Corporation. See Independent Audit Record 2008-2012; Independent Audit Records 2012-2014; Ritch Aff. ¶ 3. However, the Charter School Corporation's Accounting Department "monitor[s] the financial performance of The Villages Lifelong Learning College separately and track[s] its performances internally within the organization." Ritch Aff. ¶ 3.

### 3.      Plaintiffs' requests for sign language interpreters at the LLC

Plaintiffs have requested that the LLC provide sign language interpreters for LLC courses and lectures. McDaniel Dep. at 46-48. According to McDaniel, he became aware of these requests through the Director of the LLC, Michelle Shideler. McDaniel Dep. at 48-49; Shideler Aff. ¶ 2. At that point, McDaniel told Shideler to investigate whether it would be possible for the LLC to provide sign language interpreters. McDaniel Dep. at 49-50. Shideler inquired into the cost and availability of providing interpreters and reported back to McDaniel that providing sign language interpreters was not something the LLC could do due to the "sustainability" and "availability" of providing such an accommodation. Shideler Aff. ¶ 10; McDaniel Dep. at 49-51. McDaniel testified that providing sign language interpreters would not be sustainable because it was cost prohibitive for the LLC and that there was not adequate availability of certified sign language interpreters. McDaniel Dep. at 50-51. As such, the Charter School Corporation has never provided certified sign language interpreters for LLC courses. Deposition of Michelle Shideler at 22-23 (Doc. 142-3; Shideler Dep.).[46]

### 4.      Dragon NaturallySpeaking

In 2012, the LLC purchased the Dragon NaturallySpeaking ("DNS") program, an automatic speech recognition talk-to-text program, for use in LLC courses and lectures. See Report of Mark A. Mandel at 3 (Doc. 142-11; Mandel Report); see Shideler Dep. at 44. Soon thereafter, the LLC attempted a "trial run" of DNS at the LLC Instructor Catalog Meeting with Plaintiff Lynn Stirling. See Shideler Dep. at 47-48, 50, 160. Shideler testified

---

[46] Shideler also testified that only one deaf individual, Bernie Brown, has enrolled for a class through the LLC. Shideler Dep. at 57.

that she would "evaluate the meeting as" "promising." Id. at 169.  However, Stirling testified that some of the words that showed up on the screen "didn't make any sense" and that she became frustrated with the program and asked for an interpreter.  See Deposition of Lynn Stirling at 84-85 (Doc. 131-31).

Next, in the spring of 2013, Shideler conducted an office demonstration of DNS for Plaintiffs Beth and Stephen Holst.  Shideler Dep. at 142-43.  Beth Holst testified that since she was able to read Shideler's lips during the demonstration, she could tell that some words displaying on the DNS screen did not match what Shideler was saying.  See Deposition of Beth Holst at 37 (Doc. 131-11).  Similarly, Stephen Holst testified that the DNS program skipped many words.  See Deposition of Stephen Holst at 21 (Doc. 131-12).  After the office demonstration, Beth Holst told Shideler that "she was displeased with the product" and "had no desire to use the product."  Shideler Dep. at 144.

In May 2014, Plaintiff Bernie Brown attended a two-day lecture on World War II taught by a guest speaker with the aid of DNS.  See Declaration of Bernie Brown in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. 153; Brown Decl.).  Prior to the lecture, the guest speaker trained with DNS for up to three and a half hours and tested it on another course.  Shideler Dep. at 197-98.  Plaintiffs included in the record a copy of the DNS transcript from this lecture.  See Lecture Transcript (Doc. 153-1; Lecture Transcript).  Shideler testified that during the lecture, no one was designated to make corrections on the screen as errors came up, and Brown was never provided with a corrected transcript.  Shideler Dep. at 83.  In his email correspondence with LLC employee Dawn Tripp following the lecture, Brown described the DNS program as showing "lots of

typos and missing words and sentences." <u>See</u> Brown E-mail (Doc. 153-2; Brown E-Mail). Additionally, Brown stated that when the speaker "used the laser to highlight information on the slides, no words were printed on the screen until long after he was finished", so he "missed out on a great deal of information." <u>Id.</u>  Further, Brown wrote that at the end of the lecture when the audience asked questions, nothing came on the screen "so [he] was completely out of the loop" and "frustrated" and "felt left out in the whole evening[.]" <u>Id.</u> Brown also complained that the transcripts sent to him in the mail from the lecture were "raw" and not corrected.  <u>Id.</u>  The Court's independent review of the Lecture Transcript reveals that it is, indeed, difficult to follow.  <u>See</u> Lecture Transcript.[47]

## B.    Plaintiffs' Objections to the Charter School Corporation's Summary Judgment Evidence

Before turning to the analysis portion of this Order, the Court will briefly address Plaintiffs' arguments regarding the admissibility of the Charter School Corporation's summary judgment evidence.  Plaintiffs argue that the Charter School Corporation's "summary judgment evidence is inadmissible to the extent [the Charter School Corporation] relies on its affidavits to prove the contents of the Charter or its finances without attaching the same as authenticated supporting evidence or certifications as required by law." Response at 24.  As such, Plaintiffs argue that the Charter School Corporation's affidavits

---

[47] For the purposes of a complete record, the Court takes the opportunity to note that one relevant distinction between American Sign Language and English is that deaf people proficient in ASL are not necessarily proficient in English.  Indeed, ASL "is a complete language with very little in common with English, apart from some signs borrowed from English words via the American manual alphabet."  Mandel Report at 4. Moreover, "the grammatical structure and word order of the two languages are quite different."  <u>Id.</u>  Indeed, Plaintiffs' expert, Mark A. Mandel, Ph.D, concluded that DNS "cannot provide adequate communicative accommodation for deaf persons.  While it may suffice in a few marginal situations, such as office visits, it is entirely inadequate to the major settings in this case, classes and groups."  <u>Id.</u> at 9.

describing its financials, rather than the financial records themselves, would be inadmissible at trial under Federal Rule of Evidence 1002.  Id.  Rule 1002 states that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required."  FED. R. EV. 1002.  "The purpose of the Rule is to prevent inaccuracy and fraud when attempting to prove the contents of a writing[.]"  U.S. v. Holland, 223 F. App'x 891, 898 (11th Cir. 2007) (citation and internal quotation marks omitted).  "However, [the Rule] only applies when the contents of the writing or recording are sought to be proved."  Id.  Here, the Charter School Corporation's representatives' affidavits are not offered to prove the contents of financial documents.  Rather, the affidavits are based on personal knowledge of the financial workings of the various entities at issue in this case.  "Under such circumstances [Rule 1002] is not implicated at all."  Holland, 223 F. App'x at 898.

Plaintiffs also argue that the Charter School Corporation's affidavits are "diametrically opposed to statements made under oath at depositions, making it possible that the affidavits are 'sham affidavits' that the Court should strike altogether."  Response at 24.  First, the Court notes that Plaintiffs do not specify what aspects of the affidavits Plaintiffs deem to be a sham.  Moreover, the relevant Background section of this Order fully sets forth the facts as represented in both the depositions and affidavits.  Indeed, the Court has conducted an independent and thorough review of the record and has noted ambiguities and contradictions where they appear.  As such, the Court finds the contested affidavits admissible and will consider them in determining whether entry of summary judgment is warranted.

C.      Analysis

The Charter School Corporation seeks summary judgment pursuant to Rule 56 as to Plaintiffs' claims under Title II of the ADA (Count II) and the RA (Count V).  Motion at 1-2.

1.      Count II: ADA

In Count II of the Complaint, Plaintiffs allege that the Charter School Corporation has violated Title II of the ADA.  See Complaint ¶¶ 346-355.  In support of this claim, Plaintiffs assert that they are qualified persons under the ADA and that "[d]efendant, The Villages Charter School, Inc. . . . is a public entity in its official capacity as defined" under Title II of the ADA.  Id. ¶¶ 348-49.  Plaintiffs further allege that the Charter School Corporation "violated Title II of the ADA in numerous ways" by failing "to maintain policies and procedures to ensure compliance with Title II of the ADA"; failing "to ensure that communications with Plaintiffs were as effective as communications with non-disabled individuals"; failing "to provide auxiliary aids and services, including qualified interpreters"; excluding "Plaintiffs from programs, services and activities of the public entity"; denying "Plaintiffs the benefit of these programs, services and activities due to their disability"; and by implementing "discriminatory policies that disparately impacted Plaintiffs and intentionally made it futile for Plaintiffs to request accommodations for the programs, services, and activities." Id. ¶ 350.  As relief, Plaintiffs seek a declaratory judgment, permanent injunctive relief, compensatory damages, and reasonable costs and attorneys fees.  Id. ¶ 355.

Plaintiffs' Title II ADA claim against the LLC is essentially identical to their Title II ADA claim against the Districts, so the legal principles set forth with respect to the Districts' Motion are equally applicable here.  The parties do not dispute that Plaintiffs are qualified

individuals with a disability.[48]   However, the parties dispute the remaining elements of

Plaintiffs' Title II ADA claim.  Specifically, the Charter School Corporation asserts that it is

not a public entity and that Plaintiffs have not been excluded from participation in or denied

the benefits of the services, programs, or activities of the Charter School Corporation.

Motion at 27-37.

In seeking summary judgment with respect to Count II, the Charter School

Corporation argues that it is undisputed that it is not a state or local government;

department, agency, special purpose district of a state or states or local government; or a

National Railroad Passenger Corporation; or an instrumentality of the State. Id. at 28.  The

Charter School Corporation also argues that it is not an instrumentality of a state because

this phrase refers to a governmental unit, not a private entity.  Id.  According to the Charter

School Corporation, it is a private, not-for-profit corporation with a private board of directors

which operates both the Villages Charter Schools and the LLC.  Id. at 29.  Further, the

Charter School Corporation asserts that even though it contracts with Sumter County to

provide a charter school for the children of employees of The Villages of Lake Sumter, Inc.,

this relationship does not make the  Charter School Corporation an "instrumentality of the

state or local government" because, according to the  Charter School Corporation, "[t]he law

is clear that even if a private entity contracts with a government entity to perform

[48] The Charter School Corporation asserts that Plaintiffs Thomas Hickey, Charles Martin, Robert McDevitt, Kathleen McElwain, Francis Langlais, Herbert Pickering, Doris Schwarz, Andrew St. John, Diane St. John, Evelyn Walker, Randall Walker, Mary Wilson, and Shirley Zimmerman have failed to set forth a prima facie case under Title II of the ADA because there is no "futility exception" under Title II of the ADA and these plaintiffs "testified that they never requested an accommodation because they believed their request would be denied." Motion at 38.  As such, the Charter School Corporation asserts that these "allegedly futile plaintiffs" should be dismissed. Id. at 39.  However, in light of the Court's analysis of the Title II ADA claim, it need not resolve this issue regarding the futility exception under Title II of the ADA.

governmental functions, it does not qualify as a 'public entity' for purposes of Title II liability."
Id.

In opposition, Plaintiffs argue that the Charter School Corporation is a public entity, and specifically that it is an "instrumentality of the state" subject to Title II of the ADA. Response at 25-26.[49] First, Plaintiffs assert that the LLC is not a separate legal entity from the Charter School Corporation and that any manner in which the funds or operations of the two are divided is without significance. Id. at 26. Additionally, Plaintiffs argue that case law dictates that a private corporation can be a public entity under Title II. Id. at 26-28. Plaintiffs also dispute the Charter School Corporation's characterization that "it is a service provider that is contracting with the state[.]" Id. at 28. Moreover, Plaintiffs contend that the Charter School Corporation is a "major component unit" of Sumter County and is therefore an "instrumentality" of Sumter County. Id. at 29-30. Last, Plaintiffs argue that Florida's charter school statute makes clear that charter schools are public schools, and, as such, the Charter School Corporation is a public entity. Id. at 30-31.

The Court first turns to the Charter School Corporation's argument that it is not an "instrumentality of a State" under Title II. The Eleventh Circuit has addressed the issue of whether a private entity that contracts with a government entity to provide a service is fairly characterized as an instrumentality of the state under Title II. See Edison v. Douberly, 604 F.3d 1307 (11th Cir. 2010). In Edison, a prisoner sued several individuals under Title II in their official capacities as employees of GEO Care Group, Inc. ("GEO"), a private prison

---

[49] The Court will cite the Response using the pagination which Plaintiffs have applied to the document rather than the pagination applied to the document by the Court's CM/ECF system.

management corporation operating a Florida state prison.  604 F.3d at 1308.[50] GEO moved

for summary judgment on the grounds that it was not an instrumentality of a state under Title

II.  Id.  In determining that GEO was not a public entity subject to Title II, the Eleventh Circuit

cited with approval Green v. New York, 465 F.3d 65 (2d Cir. 2006), stating that "[e]ven

where such a private entity contracts with a government to perform a traditional and

essential government function, it remains a private company, not a public entity." Edison,

604 F.3d at 1310.  Indeed, the court borrowed further from Green in defining "the term

'instrumentality of a State'" as "refer[ring] to governmental units or units created by them."

Id.  Applying this definition, the court concluded that "a private corporation is not a public

entity merely because it contracts with a public entity to provide some service" and that

"[s]ince GEO is such a private corporation, [it] is not a public entity subjecting it to liability

under Title II of the ADA and is, therefore, not a proper defendant in this action." Id.

        Under Florida law, "[c]harter schools are nonsectarian public schools that operate

under a performance contract (charter) with a public sponsor - either a district school board

or university." Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Sch., Inc., 3 So. 3d 1220,

1228 (Fla. 2009) (citing FLA. STAT. § 1002.33(1), (7), (9)(a)).  "An application for a new

charter school may be made by an individual, teachers, parents, a group of individuals, a

municipality, or a legal entity organized under the laws of Florida." FLA. STAT. §

1002.33(3)(a).  Here, the record establishes that the Charter School Corporation is the "legal

---

        [50] The court noted that although GEO was not named as a defendant, because the plaintiff sued the
defendants in their "official capacities", the lawsuit was really a suit against the alleged "public entity" GEO such
that the plaintiff's theory was that GEO was a public entity under the ADA and therefore its employees had
official capacities. Edison, 604 F.3d at 1308 n.1.

entity" which operates the Villages Charter Schools with Sumter County as the public sponsor. The record further establishes that the Villages Charter Schools are public schools as defined under Florida law, and, therefore, are public entities under Title II of the ADA. The Charter School Corporation and the Villages Charter Schools, however, are not one in the same. The Court recognizes that at many places in the record, the line between the Villages Charter Schools and the Charter School Corporation is blurred. However, the defendant in this action, the Charter School Corporation, is a private corporation, and a separate legal entity from the Villages Charter Schools which it operates.[51]

Careful review of Florida's charter school statute further confirms that the Charter School Corporation and the Villages Charter Schools are considered separate legal entities under the law. The statute requires that a charter school's charter must have written into it

> [t]he term of the charter which shall provide for cancellation of the charter if insufficient progress has been made in attaining the student achievement objectives of the charter and if it is not likely that such objectives can be achieved before expiration of the charter . . . In addition, to facilitate access to long-term financial resources for charter school construction, charter schools that are operated by a private, not-for-profit, s. 501(c)(3) status corporation are eligible for up to a 15-year charter, subject to approval by the district school board. Such long-term charters remain subject to annual review

---

[51] Accordingly, the Court does not disagree with Plaintiffs' contention that "[c]harter schools are public entities that the State of Florida regulates as public schools." Response at 30. However, the provisions of the Florida Statutes which Plaintiffs cite apply to charter schools - not the entities which operate them. For example, Florida Statutes § 218.39 requires charter schools to complete an annual financial audit of its accounts and records. Additionally, the provisions relating to funding, facilities, and exemption from ad valorem taxes all relate to charter schools - not the entities which operate them. See FLA. STAT. §§ 1002.33(17), 1002.33(18)(c), 196.1983. Similarly, the public records requirements cited by Plaintiffs apply to public records of government agencies - not private corporations like the Charter School Corporation.

and may be terminated during the term of the charter, but only during the term of the charter pursuant to subsection (8).[52]

FLA. STAT. § 1002.33(7)(a)12. (footnote omitted).  The statute further provides that

> [w]hen a charter is not renewed or is terminated, the school shall be dissolved under the provisions of law under which the school was organized, and any unencumbered public funds, except for capital outlay funds and federal charter school program grant funds, from the charter school shall revert to the sponsor. . . .  In the event a charter school is dissolved or is otherwise terminated, all district school board property and improvements, furnishings, and equipment purchased with public funds shall automatically revert to full ownership by the district school board, subject to complete satisfaction of any lawful liens or encumbrances.

FLA. STAT. § 1002.33(8)(e).  These provisions reflect that a public sponsor may terminate a charter, causing the charter school to be dissolved.  However, these provisions do not suggest that the legal existence of the operator of the charter school is in any way affected by the termination of the charter or the dissolution of a charter school.  Thus, should Sumter County decide to terminate the Villages Charter Schools' charters, this action would close the elementary, middle, and high schools, but would have no effect on the Charter School Corporation's legal existence or on its right, should it choose to do so, to continue to operate the LLC.

Further, the charter school statute includes a provision titled "CHARTER SCHOOL REQUIREMENTS" which sets forth the minimum standards for charter schools, such as that they be "nonsectarian", that they admit eligible students as identified in the statute, that they not charge tuition or registration fees, and that they not violate anti-discrimination provisions

---

[52] Subsection (8) of the charter school statute provides the grounds on which a sponsor may choose to not renew or terminate a charter and provides the procedure which a sponsor must follow in terminating the charter.  See FLA. STAT. § 1002.33(8).

under Florida law.  FLA. STAT. § 1002.33(9).  These obligations are distinct within the statute from the obligations and responsibilities imposed on the "governing body of the charter school", which is "responsible for", among other things, "[e]nsuring that the charter school has retained the services of a certified public accountant or auditor for the annual financial audit, pursuant to s. 1002.345(2), who shall submit the report to the governing body[,]" reviewing audit reports, and participating in governance training. Id. § 1002.33(9)(j).  Thus, the Florida Statutes contemplate that the charter school and its governing body are two distinct legal entities with separate obligations and responsibilities.  Indeed, several other provisions of the charter school statute establish that under Florida law, the public charter school is one legal entity, and the entity which creates and operates the charter school is a separate legal entity.  See, e.g., id. §§ 1002.33(9)(k), (12), (16).

With this understanding of Florida's charter school statute, the Court finds Edison controlling.  The defendant in this action, the Charter School Corporation, is a private corporation which has contracted (by charter) with a public entity, Sumter County, to provide the service of operating public charter schools.  It is not an "instrumentality of a State" under Title II because it is not a governmental unit or created by a governmental unit.  As such, the Charter School Corporation is not a public entity subjecting it to liability under Title II and is, therefore, not a proper defendant in this action.

In reaching the conclusion that the Charter School Corporation is not an "instrumentality of a State", the Court has considered Plaintiffs' arguments to the contrary and finds them to be unavailing.  Plaintiffs maintain that Sumter County considers the Charter School Corporation "not to be a contracted entity, but rather to be a 'major

component unit.'" Response at 29.  Indeed, financial statements from Sumter County do not treat the Charter School Corporation and the Villages Charter School as distinct legal entities.  An excerpt from a Sumter County audit for the fiscal year ending June 30, 2013, provides:

**Discretely Presented Component Unit.** . . .

The Villages Charter School, Inc. (Charter School) is a not-for-profit corporation organized pursuant to Chapter 617, Florida Statutes, the Florida Not For Profit Corporation Act, and Section 1002.33, Florida Statutes.  The Charter School operates under a charter approved by its sponsor, the Sumter County District School Board.  The Charter School is considered to be a component unit of the District because the District is financially accountable for the Charter School as the District established the charter school by approval of the charter, which is tantamount to the initial appointment of the Charter School, and there is the potential for the Charter School to impose specific financial burdens on the District.  In addition, pursuant to the Florida Constitution, the Charter School is a public school and the District is responsible for the operation, control, and supervision of public schools within the District.  The District considers the Charter School to be a major component unit based on its significance to the District.

See Sumter County Audit at 33 (Doc. 142-7; Sumter County Audit).  Plaintiffs argue that these statements indicate that the Charter School Corporation is an "instrumentality" of Sumter County and is subject to Title II.  Response at 30.  Although the Sumter County Audit loosely treats the Charter School Corporation and the Villages Charter Schools as if they are one in the same, this does not alter the reality of their actual distinct identities under the law.  Under Florida's charter school statute, a charter school's sponsor, here Sumter County, has many duties, which include monitoring and reviewing the charter school in its progress towards the goals established in the charter and monitoring the revenues and expenditures of the charter school.  FLA. STAT. § 1002.33(5)(b).  As such, financial data relating to the

Villages Charter Schools is included in the Sumter County Audit.  The sponsor does not have these duties with respect to the operator of a charter school.  Accordingly, the charter school statute dictates that the Villages Charter Schools are major component units of Sumter County, but the same cannot be said for the entirety of the Charter School Corporation.

Plaintiffs also argue that <u>Johnson v. Fla. High Sch. Activities Ass'n, Inc.</u>, 899 F. Supp. 579 (M.D. Fla. 1999), vacated on other grounds, <u>Johnson v. Fla. High Sch. Activities Ass'n, Inc.</u>, 102 F.3d 1172 (11th Cir. 1997), "stands for the proposition that a private nonprofit corporation acting in the educational sphere can be deemed a public entity under Title II of the ADA."  Response at 27.  In <u>Johnson</u>, the Florida High School Activities Association, Inc. ("FHSAA"), argued that it was not a public entity subject to Title II of the ADA.  <u>Id.</u> at 583. The court rejected this argument, stating that

> The FHSAA is a non-profit corporation which regulates the interscholastic activities of Florida high school students. As the regulatory arm for Florida high schools, its actions have been deemed state actions. <u>The Florida High Sch. Activities Ass'n, Inc. v. Thomas</u>, 434 So.2d 306, 308 (Fla.1983). The <u>Thomas</u> court specifically noted that since the FHSAA has "exclusive authority and responsibility for controlling all aspects of interscholastic activities in both public and private high schools throughout Florida," its actions constitute state action. <u>Id.</u> Thus, since its actions are deemed state action, it follows that the FHSAA is an "instrumentality of the state" and is therefore a "public entity."

<u>Id.</u> at 583-84 (citation omitted).  The other state athletic association cases cited by Plaintiffs were decided on similar grounds.  <u>See, e.g.</u>, <u>Steines ex rel. Steines v. Oh. High Sch. Athletic Ass'n</u>, 68 F. Supp. 3d 768, 775 (S.D. Ohio 2014), vacated on other grounds, <u>C.S. v. Oh. High Sch. Athletic Ass'n</u>, Case No. 1:14-cv-525, 2015 WL 4575217 (S.D. Ohio July 29, 2015) (finding that the Ohio State Athletic Association is an instrumentality of the State and

"public entity" under Title II of the ADA because the evidence demonstrated that "Ohio has delegated a substantial amount of state authority to the OHSAA" in that "the great majority of OHSAA's members are public schools, it frequently uses public facilities, and it exercises the ability to sanction public schools for violations of its rules").

Relying on these cases, Plaintiffs argue that "it follows easily that charter schools are instrumentalities of the state as well, since Florida law defines them as public schools . . . and grants them authority and responsibility for controlling scholastic activities" and that "[i]t does not follow that, just because Defendant is incorporated, it is private rather than a public entity for purposes of the ADA." Response at 28. However, the Court finds this line of cases and argument unpersuasive for two reasons. First, the fact that the FHSAA was deemed to be a public entity rested on the fact that the FHSAA was the "regulatory arm" for the interscholastic activities of Florida high schools. Johnson, 899 F. Supp. at 583. Indeed, the court explained that "the FHSAA ha[d] exclusive authority and responsibility for controlling all aspects of interscholastic activities in both public and private high schools throughout Florida[.]" Id. This fact rendered it a state actor, and thus, an instrumentality of the state for purposes of Title II. Id. at 583-84. No comparable facts are present here with regard to the Charter School Corporation which simply operates the charter schools under the supervision of Sumter County as the state actor. Further, Plaintiffs' argument, once again, ignores the distinction between the Villages Charter Schools and the Charter School Corporation. Florida law defines the Villages Charter Schools as public schools and grants the Villages Charter Schools responsibility for scholastic activities, not the Charter School Corporation.

-76-

Additionally, perhaps in an attempt to distinguish <u>Edison</u>, Plaintiffs assert that characterizing the Charter School Corporation as a "service provider that is contracting with the state" mischaracterizes what a charter school is and does.  Response at 28.  Plaintiffs cite <u>Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.</u>, 908 F. Supp. 2d 597 (M.D. Pa. 2012), a case in which the court was faced with deciding whether a charter school, which, under Pennsylvania law, must be organized as a public, nonprofit corporation and is therefore a "person" for purposes of bringing suit under 42 U.S.C. § 1983, was "'like a municipality, barred from bringing suit against its creator or charter-grantor.'"  <u>Pocono Mountain</u>, 908 F. Supp. 2d at 606; <u>see</u> <u>also</u> 24 PA. STAT. ANN. § 17-1703-A ("'Charter school' shall mean an independent public school established and operated under a charter from the local board of school directors and in which students are enrolled or attend. A charter school must be organized as a public, nonprofit corporation. Charters may not be granted to any for-profit entity.").  Ultimately concluding that "the Charter School is sufficiently analogous to a municipal corporation to preclude it from asserting its § 1983 claims against the District in this case", the court examined the relationship between charter schools and school districts under Pennsylvania law.  <u>Id.</u> at 609, 614.  In doing so, the court observed that this relationship "is not a contract that outsources public education, but [rather] the establishment of schools to provide students with a public education."  <u>Id.</u> at 609 (internal quotation marks and citation omitted) (alteration in original).  The court further reasoned that charter schools are "agencies under Pennsylvania's Right-to-Know Act because they perform 'an essential governmental function'", and are therefore "independent public schools created for the

purpose of providing the essential governmental service of education in a constitutionally mandated manner[.]" Id.

Plaintiffs contend that the Pocono Mountain court's analogy between not-for-profits that operate charter schools and municipal corporations "can easily be imported to the present case." Response at 28. This argument is unpersuasive. First, under Pennsylvania law, charter schools must be organized as nonprofit corporations. There is no such requirement under Florida law. Indeed, for all the reasons the Court has already discussed, there appears to be a distinction under Florida law between a public charter school and the nonprofit corporation which operates the charter school. Second, the rationale underlying the court's decision in Pocono Mountain stands contrary to the Eleventh Circuit's rationale in Edison. In Edison, the Eleventh Circuit cited with approval the Second Circuit's statement in Green in explaining the meaning of "instrumentality":

> Even where such a [parallel] private entity contracts with a government to perform a traditional and essential government function, it remains a private company, not a public entity. A private contractor does not, the court held, become liable under Title II merely by contracting with the state to provide government services, essential or otherwise.

Edison, 604 F.3d at 1310. Thus, the rational underlying Pocono Mountain, that an agency of the state of Pennsylvania exists where the entity is created for the purpose of performing an essential governmental service, is inconsistent with the Eleventh Circuit's reasoning in Edison that performing a traditional or essential governmental function does not transform a private corporation into a public entity under Title II.

Further, Pocono Mountain and several other cases which Plaintiffs cite for the proposition that charter schools are state actors for purposes of constitutional violations

under § 1983 are of limited assistance to the extent Plaintiffs intend to rely on § 1983 cases to establish that the Charter School Corporation is a public entity under Title II. <u>See, e.g.</u>, <u>ACLU of Minn. v. Tarek Ibn Ziyad Academy</u>, Civil No. 09-138 (DWF/JJG), 2009 WL 2215072, at *9 (D. Minn. July 21, 2009) (charter school a state actor for purposes of § 1983 claim); <u>Irene B. v. Philadelphia Academy Charter Sch.</u>, No. Civ.A. 02-1716, 2003 WL 24052009, at *11 (E.D. Pa. Jan. 29, 2003) (charter school subject to liability under § 1983). Binding authority in this circuit dictates that an "instrumentality" of the government subject to liability under Title II must be an entity that is either part of or created by the government itself. <u>Edison</u>, 604 F.3d at 1309. Plaintiffs have cited no authority suggesting that, despite <u>Edison</u>, it would be proper to look to § 1983 cases to expand the definition of an instrumentality as used in the ADA. Accordingly, the Court declines to do so.

Because the Charter School Corporation is not a public entity under Title II of the ADA, the Court declines to address whether Plaintiffs have been excluded from participation in or denied the benefits of the services, programs, or activities of the Charter School Corporation as defined under Title II of the ADA. As such, there are no genuine issues of material fact with respect to Plaintiffs' ADA claim, and summary judgment is due to entered in favor of the Charter School Corporation as to Count II of the Complaint.

### 2.    Count V: Rehabilitation Act

In Count V of the Complaint, Plaintiffs assert a claim under the RA against the Charter School Corporation. <u>See</u> Complaint ¶¶ 380-385. Plaintiffs allege that they are deaf and hard of hearing persons and are thus qualified persons as required by the RA. <u>Id.</u> ¶ 382. Plaintiffs further allege that "Defendant, [t]he Villages Charter School Inc. . . . is a

College or post secondary institution principally engaged in the provision of education and that receives federal funding and is required to comply with the mandates under Section 504 of the [RA]." Id. ¶ 383.  Additionally, Plaintiffs allege that the Charter School Corporation's "programs, services, and activities including courses, lectures and other educational offerings are covered programs or activities under the [RA]." Id. ¶ 384.  Plaintiffs further plead that the Charter School Corporation has violated section 504 of the RA based on the allegations which form the basis of Plaintiffs' Title II ADA claim. Id. ¶ 385.  Plaintiffs seek a declaratory judgment, permanent injunctive relief, compensatory damages, and reasonable costs and attorneys' fees. Id. at 57-58.

To establish a violation of section 504 of the RA, a plaintiff must meet four requirements: "1) she is a 'handicapped individual,' 2) she is 'otherwise qualified' for participation in the program, 3) the program receives 'federal financial assistance,' and 4) she was 'denied the benefits of' or 'subject to discrimination' under the program." Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991); see Doherty v. S. Coll. of Optometry, 862 F.2d 570, 573 (6th Cir. 1988).  Additionally, "[t]o recover compensatory damages under [section] 504, Plaintiff[s] must demonstrate that the discrimination was intentional." Wendel v. Fla. Dept. of Highway Safety & Motor Vehicles, 80 F. Supp. 3d 1297, 1302 (M.D. Fla. 2015); see also Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1191 (11th Cir. 2007) (stating that "victims of intentional discrimination may recover compensatory damages" while "victims of unintentional discrimination may be limited to prospective relief preventing future violations").

The parties do not appear to dispute the first three elements of Plaintiffs' RA claim. Indeed, in the Motion, the Charter School Corporation appears to seek summary judgment based on the fourth element alone. See Motion at 30. Specifically, the Charter School Corporation appears to center its entire argument on the assertion that providing sign language interpreters is an undue hardship for the LLC. Id. at 31-37. However, at the Final Pretrial Conference, the Court expressed some concern over whether the Charter School Corporation - rather than the Villages Charter Schools - is a recipient of federal financial assistance.[53] Nevertheless, as stated by the Court at the Final Pretrial Conference, because the Charter School Corporation concedes that it is a recipient of federal funds and does not move for summary judgment on this basis, the Court will assume that it is, in fact, the recipient of federal funds.[54] As such, the Court will turn to the fourth element of Plaintiffs' RA claim, whether Plaintiffs were denied the benefits of or subject to discrimination in the Charter School Corporation's LLC programs.

---

[53] For example, the deposition testimony of Ritch and McDaniel paint a puzzling picture regarding the flow of federal funds to these entities. See Ritch Dep. at 26; McDaniel Dep. at 29-31, 34-35. Additionally, Florida's charter school statute seems to indicate that charter schools - not their operators - receive federal funds. See FLA. STAT. §§ 1002.33(17)(c)-(d), 1002.33(20)(a)1 (providing that "all charter schools shall receive all federal funding for which the school is otherwise eligible, including Title I funding, not later than 5 months after the charter school first opens and within 5 months after any subsequent expansion of enrollment" and that "any funds due to the charter school under the federal lunch program be paid to the charter school as soon as the charter school begins serving food under the federal lunch program").

[54] Relatedly, Plaintiffs contend that the Charter School Corporation asserts that "while it receives federal funds, it is not subject to the [RA] since it does not use any federal funds for the [LLC]." Response at 38. However, the Charter School Corporation does not raise this argument in the Motion. Moreover, the Court is in agreement with Plaintiffs that "[a]n entire private corporation will . . . be covered under [the RA] if financial assistance is granted to the corporation 'as a whole' or if it is principally engaged in the business of providing education, health care, housing social services, or parks and recreation." Squire v. United Airlines, Inc., 973 F. Supp. 1004, 1008 (D. Colo. 1997) (citing 29 U.S.C. § 794(b)(3)(A)(I) and (ii)); Runnion ex. rel. Runnion v. Girl Scouts of Greater Chicago, 786 F.3d 510, 517 (7th Cir. 2015) (same). Thus, the Court does not dispute that all of the Charter School Corporation's programs, including the LLC, are covered under the RA.

With respect to the fourth element of Plaintiffs' RA claim, the Charter School Corporation asserts that Plaintiffs "have never been excluded from participation in or denied the benefits of the services, programs, or activities of The Villages Charter School[,] Inc.[,] or any of its programs including the [LLC]." Motion at 30. The Charter School Corporation explains that the LLC "has bent over backwards to find a financially feasible accommodation for the plaintiffs including purchasing and being trained on the Dragon Speak Naturally [sic] talk to text program, providing transcripts for any courses or lectures, and allowing the plaintiffs to bring their own interpreter with them to attend any course or lecture free of charge." Id. Further, the Charter School Corporation asserts that "[o]n one occasion, the [LLC] even offered to conduct a one-on-one class for a plaintiff." Id. Despite these assertions, the Charter School Corporation does not appear to seek summary judgment on the basis that these accommodations were sufficient to satisfy its obligations under the RA.[55] Rather, the Charter School Corporation appears to argue, as the sole basis for its motion for summary judgment, that the provision of sign language interpreters would constitute an undue hardship under the RA. Id. at 31-37. Indeed, because the Charter School Corporation offers no substantive arguments to support that it has offered a reasonable accommodation under the RA, the Court will limit its analysis to whether the provision of sign language interpreters constitutes an undue hardship. In opposition, Plaintiffs argue that the

---

[55] However, to the extent the Charter School Corporation contends that DNS is a reasonable accommodation sufficient to satisfy its obligation under the RA to furnish auxiliary aids, the Court determines that genuine issues of material fact preclude summary judgment on this basis. There is evidence in the record that four Plaintiffs have tried the DNS program with poor results. Additionally, Plaintiffs' expert's report concludes that DNS is not an effective accommodation. Accordingly, to the extent the Charter School Corporation seeks summary judgment on the basis that DNS is a reasonable accommodation, the Court will deny the Motion.

Charter School Corporation has violated the RA because it has not provided effective auxiliary aids in the form of sign language interpreters.  Response at 38-40.  Further, Plaintiffs assert that summary judgment is inappropriate because whether the provision of sign language interpreters is an undue hardship constitutes a disputed question of fact.  Id. at 40-45.

The crux of the parties' dispute with respect to Plaintiffs' RA claim is that Plaintiffs contend that sign language interpreters are a required reasonable accommodation, but the Charter School Corporation maintains that sign language interpreters are an undue hardship and are, therefore, not required.  Preliminarily, the Court observes that "the reasonable-accommodation principle (that a disabled person is entitled to participate in a program, notwithstanding lack of qualification, if a reasonable accommodation would qualify him) does not appear in [section] 504."  Onishea v. Hopper, 171 F.3d 1289, 1301 (11th Cir. 1999) (citing 29 U.S.C. §§ 706, 694).  Instead, "[t]he principle appears . . . in agency regulations promulgated under the statute's authority."  Id.  Moreover, "[t]he applicability of these regulations as a general rule follows federal funding from an agency."  Id.  Indeed, in Onishea, the Eleventh Circuit observed that

> [u]nfortunately, the district court denied the plaintiffs discovery of the source of the Department of Corrections' federal funding, and the plaintiffs did not pursue questioning on this subject at trial. Thus, with one exception, we do not know what regulations apply to the Department of Corrections.  And this matters: Different agency regulations lay out the contours of the reasonable-accommodation principle differently.  For instance, Department of Justice regulations require no accommodation at all in nonemployment programs . . ., while Department of Labor regulations require reasonable accommodation in employment training programs[.]

-83-

Id. Ultimately, however, because the parties briefed the issue, and "[r]ather than disturb what ha[d] become the parties' settled expectations," the Eleventh Circuit in Onishea "elect[ed] to apply some sort of least-common-denominator reasonable accommodation principle" while "look[ing] to some regulations for guidance", yet acknowledging that the court's "interpretation . . . would not trump any agency regulation that interprets [section] 504 differently." Id. at 1302.

Consistent with the teaching of Onishea, the proper starting point for the Court's analysis is to identify which federal agencies distribute the financial assistance at issue and which regulations apply to determine what accommodations are required. Id. at 1301. However, the parties did not brief the issue in this manner. Motion at 31-37; Response at 37-45. Accordingly, at the Final Pretrial Conference, the Court directed the parties to file supplemental briefing identifying which agencies are providing the federal funding and what accommodation obligations those agencies impose. See Clerk's Minutes; September 4, 2015 Order (Doc. 178; September 4, 2015 Order). Additionally, because Plaintiffs' Complaint and Response refer to the Charter School Corporation as a "postsecondary institution," see Complaint ¶ 383; Response at 38, at the Final Pretrial Conference, the Court raised the issue of whether the Charter School Corporation is, in fact, a postsecondary institution. Accordingly, the Court also ordered the parties to brief whether the Charter School Corporation, for purposes of the agency regulations, is a postsecondary institution or a corporation principally engaged in the business of providing education. See Clerk's Minutes; September 4, 2015 Order.

###### i.      The applicable agency regulations

In its supplement brief, the Charter School Corporation identifies the Department of Education ("DOE") and Department of Agriculture ("DOA") as the agencies which provide its federal funding.  Defendant's Supplement at 2.[56]  The Charter School Corporation further argues that it is not a postsecondary institution and cites several DOE and DOA regulations which it asserts apply to the LLC's "adult recreational classes."  Id. at 5-7, 9-13.  In their supplemental brief, Plaintiffs agree that the Charter School Corporation is subject to the regulations promulgated by the DOE and DOA by virtue of its receipt of funds but disagree with the Charter School Corporation regarding which regulations are applicable.  See generally Plaintiffs' Supplement.

The DOE and DOA have promulgated regulations which govern "nondiscrimination on the basis of handicap in programs or activities receiving federal financial assistance."  See 34 C.F.R. § 104; 7 C.F.R. § 15b.  These regulations are divided into subparts which cover various topics.  Under both the DOE and DOA regulations, Subpart A contains "General Provisions", Subpart B contains regulations relating to "Employment Practices", Subpart C contains regulations relating to "Accessability", and Subpart E contains provisions

---

[56] The Charter School Corporation's Independent Audit Records for 2012-2014 contain a document titled, "Schedule of Expenditures of Federal Awards for the Year Ended June 30, 2012, The Villages Charter School, The Villages, Florida."  Independent Audit Records 2012-2014 at 6.  This document shows that for the year ending June 30, 2012, the U.S. Department of Education was a "grantor" for funds that "[p]assed thru the Sumter County School Board."  Id.  These funds are labeled: 1) "Career and Technical Education - Basic Grants to States"; 2) "Special Education - Grants to States, Recovery Act"; 3) "Race to the Top Fund Incentive Grants, Recovery Act".  Id.  The document also shows the "U.S. Department of Agriculture" as the grantor for funds which "[p]assed thru the Florida Department of Education."  Id.  These funds are labeled "National School Lunch Program" and "School Breakfast Program" under the heading, "Child Nutrition Cluster".  Similar documents for the fiscal years ending June 30, 2010, June 30, 2011, and June 30, 2014, show the Department of Education and Department of Agriculture as grantors with respect to similar, but not identical, programs.  See Independent Audit Records 2008-2012 at 82, 120; Independent Audit Records 2012-2014 at 76.

relating to "Postsecondary Education."  See 34 C.F.R. § 104; 7 C.F.R. § 15b.  The DOE's

Subpart D contains provisions relating to "Preschool, Elementary, and Secondary

Education", while the DOA's Subpart D contains provisions relating to "Preschool,

Elementary, Secondary, Adult, and Extension Education."  34 C.F.R. § 104.31; 7 C.F.R. §

15b.20.  The DOE's Subpart F contains provisions relating to "Health, Welfare, and Social

Services", while the DOA's Subpart F contains provisions relating to "Other Aid, Benefits,

or Services."  34 C.F.R. § 104.51; 7 C.F.R. § 15b.36.  The Charter School Corporation

argues that Subparts B and C of the DOE and DOA regulations do not apply, see

Defendant's Supplement at 6, 7, and Plaintiffs do not address these Subparts in their

supplemental brief, see generally Plaintiffs' Supplement.  Because employment practices

and accessability to facilities are not at issue in this case, the Court need not address

Subparts B and C.  Accordingly, the Court will turn its discussion to the remaining

regulations.

The Charter School Corporation and Plaintiffs agree that Subparts A, the "General

Provisions" of both the DOE and DOA regulations, are applicable to the Charter School

Corporation.  Relevant to the instant action, the DOE regulations require that

> [a] recipient, in providing any aid, benefit, or service, may not, directly or
> through contractual, licensing, or other arrangements, on the basis of
> handicap . . . [p]rovide a qualified handicapped person with an aid, benefit, or
> service that is not as effective as that provided to others[.]

34 C.F.R. § 104.4(b)(1)(iii); see also 7 C.F.R. § 15b.4(  b)(1)(iii).[57]  The DOE and DOA

regulations also require that

---

[57] The DOA regulation differs in a slight but non-substantive manner.

aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped person equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

34 C.F.R. § 104.4(b)(2); 7 C.F.R. § 15b.4(b)(2). Additionally, the DOA regulations provide, "Recipients shall take appropriate steps to ensure that communications with their applicants, employees, and beneficiaries are available to persons with impaired vision and hearing." 7 C.F.R. § 15b.4(d).

The Charter School Corporation and Plaintiffs disagree on the applicability of Subparts D and E.[58] The Charter School Corporation maintains that these Subparts are not applicable. See generally Defendant's Supplement. However, Plaintiffs argue that the Charter School Corporation must comply with Subpart E since LLC courses are "postsecondary courses" and also that at the very least, Subpart D "provide[s] guidance as to how handicapped individuals may be accommodated under the [RA.]" Plaintiffs' Supplement at 11-12. Plaintiffs further assert that "[w]hether Defendant must comply with Subparts D or E, the substantive action it must take to do so will be the same." Id. at 12.

_____

[58] Subpart D of the DOE regulations "applies to preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31. Similarly, Subpart D of the DOA regulations "applies to public and private schools, elementary, secondary, adult, and extension education programs or activities that receive Federal financial assistance provided by the Department of Agriculture after that effective date of this part and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 7 C.F.R. § 15b.20.
Subpart E of the DOE regulations "applies to postsecondary education programs or activities, including postsecondary vocational education programs or activities, that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.41. Subpart E of the DOA regulations "applies to public and private postsecondary education programs or activities, including postsecondary vocational education programs and activities, that receive Federal financial assistance provided by the Department of Agriculture after the effective date of this part." 7 C.F.R. § 15b.29.

Ultimately, however, the Court need not determine whether Subparts D or E apply to the Charter School Corporation because Subpart F of the DOA regulations,[59] which the Charter School Corporation labels the "catch-all" Subpart and which "applies to aid, benefits, or services, other than those covered by Subparts D and E", contains an auxiliary aids regulation which imposes an accommodation obligation no less demanding than the auxiliary aids provisions in Subparts D and E:

> (a) A recipient to which this subpart applies that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question.
>
> (b) The Secretary may require recipients with fewer than fifteen employees to provide auxiliary aids where the provision of aids would not significantly impair the ability of the recipient to provide its benefits or services.
>
> (c) For the purpose of this section, auxiliary aids may include Brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision.

---

[59] Subpart F of the DOE regulations applies to "Health, Welfare, and Social Services", which by its terms is not applicable to the Charter School Corporation or the LLC courses. See 34 C.F.R. § 104.51.

7 C.F.R. § 15b.37.[60]  While Plaintiffs do not reference Subpart F or this particular auxiliary

aid regulation in their supplemental brief, <u>see</u> <u>generally</u> Plaintiffs' Supplement, the Charter

School Corporation asserts that subsections (b) and (c) of this regulation are applicable in

this case, <u>see</u> Defendant's Supplement at 5.  The distinction between subsections (a) and

(b) hinges on whether the "recipient" employs fifteen or more persons.  <u>See</u> 7 C.F.R. §§

15b.37(a), 15b.37(b). Although the Charter School Corporation notes that the LLC "has a

staff of only four full-time employees", <u>see</u> Defendant's Supplement at 5 n.11 (citing

McDaniel Aff. ¶ 23), the "recipient" of federal funds in this case is the Charter School

Corporation.  The Charter School Corporation does not cite to any portion of the record

indicating how many people the Charter School Corporation employs, and in its independent

review, the Court has not found this information.  Thus, the Charter School Corporation has

---

[60] Compare the auxiliary aids provision found in Subpart F of the DOA regulation with Subparts D of the DOE and DOA regulations which provide, "A recipient shall place a handicapped person in the regular education environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 104.34(a); 7 C.F.R. § 15b.23(a).
   Also compare with Subparts E of the DOE and DOA regulations which provides:

   (d) <u>Auxiliary aids</u>.

       (1) A recipient to which this subpart applies shall take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills.

       (2) Auxiliary aids may include taped texts, interpreters or other effective methods of making orally delivered materials available to students with hearing impairments, readers in libraries for students with visual impairments, classroom equipment adapted for use by students with manual impairments, and other similar services and actions. Recipients need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature.

34 C.F.R. § 104.44(d); 7 C.F.R. § 15b.32(d).

not born its burden of demonstrating the inapplicability of the more exacting standard under subsection (a).[61]    As such, the Court concludes that the applicable accommodation obligation is found in subsection (a), which the Charter School Corporation may satisfy by providing interpreters or "other aids."  7 C.F.R. §§ 15b.37(a), 15b.37(c).

Whether an entity subject to the RA has provided appropriate auxiliary aids is necessarily an inherently fact-intensive question.  See, e.g., Martin v. Halifax Healthcare Sys., Inc., No. 14-12771, 2015 WL 4591796, at *7 (11th Cir. July 31, 2015) (noting that "[i]n accordance with the" applicable regulations, the Eleventh Circuit "has recognized that the question whether a hospital has provided appropriate auxiliary aids to a deaf patient is generally a 'fact-intensive' inquiry that depends on context, especially the nature, significance, and complexity of the involved treatment"); Chisolm v. McManimon, 275 F.3d 315, 331 (3d Cir. 2001) (reversing the district court's grant of summary judgment in finding that "it is up to the trier of fact to determine whether the [state court] provided a sufficient auxiliary aid and/or service when it rescheduled [the inmate-plaintiff's] hearing and ordered him remanded into custody for a further six days until an ASL interpreter could be present"); Randolph v. Rodgers, 170 F.3d 850, 859 (8th Cir. 1999) (reversing the district court's grant of summary judgment in favor of the inmate-plaintiff because the defendants were entitled to have a trier of fact consider their evidence that the plaintiff's "request for an interpreter created safety and security issues, as well as placed a financial burden on the prison").

---

[61] Additionally, because the Charter School Corporation operates the Villages Charter Schools, which teaches "nearly 3,200 students", McDaniel Aff. ¶ 7, and because the Charter School Corporation's audit record show expenditures of over $9,000,000 for "Instruction", see, e.g., Independent Audit Records 2008-2012 at 102, the record indicates that the Charter School Corporation almost certainly employs well over 15 people.

However, the Charter School Corporation does not appear to dispute its duty to provide auxiliary aids.  Motion at 31.  Instead, the Charter School Corporation maintains that providing sign language interpreters constitutes an undue hardship.  Id.

The Court recognizes that the applicable regulations in the instant case do not specifically provide for an undue hardship defense.  Cf. 34 C.F.R. § 104.12(c) (listing factors to be considered in determining "whether an accommodation would impose an undue hardship on the operation of a recipient's program or activity" under the DOE's regulations regarding "Employment Practices" under Subpart B).  However, in U.S. v. Bd. of Trustees for Univ. of Ala., 908 F.2d 740 (11th Cir. 1990), the Eleventh Circuit noted that in reaching the conclusion that the DOE's auxiliary aids regulation applicable to postsecondary education is based on a permissible construction of the RA, it "considered the possibility that as applied to [the defendant], the auxiliary aids regulation might impose an 'undue financial burden'" even though this regulation does not expressly provide for an undue hardship defense.  908 F.2d at 749 n.5; see 34 C.F.R. § 104.44(d).  Accordingly, the Court will accept that as applied to the instant case, "[r]easonable accommodations are mandatory only to the point that they impose 'undue hardship' on the federal funds recipient."  Onishea, 171 F.3d at 1303 (citing 29 C.F.R. § 32.3[62]).  Indeed, the Eleventh Circuit has indicated that

> [u]nder the [RA], cost is relevant to the federal fund recipient's burden when it, like any other burden, reaches the point of "undue hardship."  This is a consistent agency interpretation of the statute: Many (if not all) regulations promulgated under the [RA] prescribe "undue hardship" as the standard for measuring when the federal funds recipient's burden is too much.

[62] 29 C.F.R. § 32.3 provides definitions for terms used in the Department of Labor's regulations relating to activities receiving federal financial assistance under the RA.

Id. (citing the regulations of the Department of Agriculture, Department of Justice, Department of Education, and Department of Health and Human Services).[63]  Moreover, Eleventh Circuit precedent reflects that "a hardship becomes undue long before it effects a 'fundamental alteration' in employment conditions or reallocation of program resources." Id. at 1304.  While, "[r]equired accommodations . . . have demanded little from federal fund recipients in either money or other resources", "regulations . . . and precedent do not fix a bright-line rule" between the two extremes.  Id.  "[B]ut they do make clear that a financial burden may become too much when it reaches the point of 'undue hardship.'" Id.[64]

### ii.    Whether the provision of sign language interpreters is an undue hardship

Turning to the facts at hand, the Court's task is to determine whether a reasonable juror could find that the provision of sign language interpreters in LLC programs would cause the Charter School Corporation an undue hardship.  The Charter School Corporation argues that "[p]roviding unlimited American sign language interpreters as requested by the plaintiffs would simply put the [LLC] out of business."  Motion at 32.  In support of this assertion, the Charter School Corporation has provided evidence that the rates for sign language interpreters are approximately $50.00 per hour with a two hour minimum.  See Citrus

---

[63] Notably, however, the regulations the Onishea court cites which are promulgated by Department of Agriculture and Department of Education relate to reasonable accommodations in reference to "employment practices[.]"  See 7 C.F.R. Sec. 15b.13(c); 34 C.F.R. Sec. 104.12(c).

[64] In Onishea, for example, the wardens of the two prisons at issue estimated that it would take about 70 additional officers to integrate the HIV-positive prisoner plaintiffs into the prison programs safely, and that this would cost $1,713,810 for the first year.  Onishea, 171 F.3d at 1304.  The budget for the entire Department of Corrections was $163,000,000, and at the time of trial, this level of funding left the first prison 35 correctional officers short and the second prison 89 correctional officers short.  Id.  As such, the Eleventh Circuit found that it "could conclude that in these circumstances spending an additional $1.7 million would cause undue hardship."  Id.

Hearing Impaired Program Services Correspondence at 3 (Doc. 133-1; Citrus Correspondence).   Based on this information, McDaniel conducted a cost analysis which, in brief, found that for a six-week LLC course that meets twice a week, the cost for an interpreter would be $1,200.00.  <u>See</u> McDaniel Aff. ¶ 19.  If the class was filled to capacity at 12 students, the LLC would incur a loss of $784.20 after the students paid course fees totaling $1,029.00[65] and the LLC paid $37.20 in rent[66] and $576.00 in instructor fees.[67]  <u>See id.</u> ¶¶ 19, 20.  McDaniel also determined that if the LLC course was filled to half capacity at six students, the LLC would incur a loss of $989.60, assuming two students paid the patron rate of $82.00, three students paid the resident rate of $87.00, and one student paid the general public rate of $92.00.  <u>Id.</u>  The Charter School Corporation argues that based on these calculations, "[a]t a minimum, the financial loss would actually be thirty two (32) times the loss described above per semester assuming that each plaintiff took only one class per semester and no other deaf individuals requested American sign language interpreters."  Motion at 32.  Thus, the Charter School Corporation asserts that this would amount to a loss of $63,334.40 per year for courses filled to capacity at 12 students and $50,188.80 per year for courses half filled at six students.  <u>Id.</u> at 32-33.  The Charter School Corporation further notes that these estimates are "conservative" as these figures do not include requests for interpreters for the speaker series which are offered 1-2 times per month, requests by

---

[65] This analysis assumed that four students would pay the "patron rate" of $82.00, seven students would pay the "resident rate" of $87.00, and one student would pay the "general public rate" of $92.00.  <u>See</u> Motion at 32; McDaniel Aff. ¶ 19.

[66] The rent is calculated at $3.10 per student.  McDaniel Aff. ¶ 19.

[67] The instructor fee is set at $48.00 per student.  McDaniel Aff. ¶ 19.

Plaintiffs who may take more than one course per semester, or requests by other deaf individuals who are not named as plaintiffs in this lawsuit. Id. at 33.  The Charter School Corporation argues that "[s]uch a financial loss would without a doubt put the [LLC] out of business." Id.  Indeed, John Wise, Vice President and CFO of the Holding Company, and Gary Lester, Vice President of Communication Relations for the Holding Company, have both sworn in their affidavits that if the LLC "were required to provide sign language interpreters for every class and lecture which is offered, it could no longer be self sustaining and therefore it would shut down."  Wise Aff. ¶ 9; see also Lester Aff. ¶ 9.

In response, Plaintiffs argue that providing sign language interpreters is not an undue financial burden, and that, at the very least, it is a disputed question of fact.  Plaintiffs first assert that the Charter School Corporation's claims regarding the undue financial burden of sign language interpreters are not supported with any "legitimate research" and, "[e]ven so, applicable DOJ regulations and case law firmly reject comparing the cost of the accommodation against the revenues for that activity, and rather direct that the cost be considered in light of the overall financial position of the covered entity."  Response at 8.  However, Plaintiffs do not explain what they mean by the Charter School Corporation's claims lacking "legitimate research."  The Charter School Corporation's burden is to produce sufficient evidence that a reasonable juror could conclude that providing sign language interpreters would constitute an undue hardship.  See Willis v. Conopco, Inc., 108 F.3d 282, 286 & n.2 (11th Cir. 1997) (stating that "establishing that a reasonable accommodation exists is a part of an ADA plaintiff's case, whereas undue hardship is an affirmative defense to be pled and proven by an ADA defendant" and citing a case interpreting RA regulations

as further explanation).  Plaintiffs have failed to cite any applicable authority which requires something more.  Additionally, the DOJ regulation which Plaintiffs cite applies to ADA claims, not the RA.  See 28 C.F.R. § 35.164.

Plaintiffs further assert that the Charter School Corporation had other flexible options which it refused to explore, including

> (i) cost spreading over the Defendant's 500 courses or over 22,000 enrollments at a nominal amount; (ii) charging a small one time registration/user fee over all of its enrollments; (iii) applying for federal, state and private grants[;] (iv) reducing expenses[;] (v) utilizing tax breaks given for providing accommodations[;] or (vi) seeking contributions from alternate sources of funding.

Response at 9.  Additionally, Plaintiffs maintain that the Charter School Corporation "treats the course fee as constant for purposes of its breakeven analysis, essentially conceding that it has not considered raising the course fee."  Id. at 44.  However, the Charter School Corporation argues that raising rates would not be a viable solution because when rates are raised, enrollment drops significantly.  Motion at 34.  Indeed, the Director of the LLC, Michelle Shideler, testified that the LLC has "considered raising the cost of courses to cover [their] expenses - - [their] yearly expenses" but that "[they] try not to raise course fees ever."  Shideler Dep. at 19.  Shideler noted that at some point in the past, the LLC raised course fees by one dollar and saw a drop in enrollment, but also acknowledged that since that time, the LLC was able to recover from that decrease in enrollment and has since seen an increase in enrollment.  Id. at 125-26.[68]  Additionally, in response to Plaintiffs' argument that

_____

[68] See also Shideler Aff. ¶ 12 ("Raising class rates to cover the cost of sign language interpreters is not a solution because it has been our past experience that when there is an increase in class rates for our senior population, the enrollment drops significantly.").

the Charter School Corporation has not considered other "flexible options" stands the Charter School Corporation's position that the LLC is financially self-sustaining through course fees.  Whether other financial options exist to finance sign language interpreters is precisely the fact-intensive question best addressed by a jury.[69]  As such, the Court will deny the Charter School Corporation's motion for summary judgment as to Plaintiffs' failure to accommodate claim under the RA because a genuine dispute of material fact exists as to whether the provision of sign language interpreters would impose an undue hardship on the Charter School Corporation.[70]

Although the Court finds that summary judgment is due to be denied as to Plaintiffs' RA claim with regard to the LLC, the Court must consider Plaintiffs' argument that the Charter School Corporation cannot establish undue hardship because it has ample financial resources in light of the Holding Company paying every deficit it incurs.  Response at 10,

---

[69] Similarly, Plaintiffs' argument that the Charter School Corporation "analyzes the breakeven point on a class-by-class basis for one particular class offered at the [LLC,]" and that the Charter School Corporation "cannot thereby prove that the same analysis would hold for each class, and certainly not the aggregate", see Response at 44, involves factual disputes best suited for the trier-of-fact.  Additionally, for these same reasons, the Charter School Corporation's assertion that providing sign language interpreters would constitute an undue administrative burden, Motion at 35-36, as well as Plaintiffs' contentions in opposition, Response at 13, 43, are factual disputes best-suited for a trier-of fact.

[70] The Court briefly addresses the Charter School Corporation's argument that plaintiffs "have taken an 'all or nothing stand' demanding unlimited American sign language interpreters for any and all courses which they could possibly want to take at any given time."  Motion at 33.  According to the Charter School Corporation, "[t]his 'all or nothing' demand has the potential to cause even exponentially larger financial losses to the [LLC]." Id.  The Charter School Corporation calculated that since the LLC offers approximately 450 courses per year, the interpreter fees per semester could be as much as $540,000 per semester ($1,200.00 x 450 classes) and $1,080,000 ($540,000.00 x 2 semesters) per year.  Id.  Plaintiffs respond in opposition by stating that the Charter School Corporation has "mischaracterize[d]" Plaintiffs' request: Plaintiffs assert that "at no point have [they] requested 'unlimited sign language interpreters at any given day' nor have [they] maintained that this is the only reasonable accommodation."  Response at 45.  However, "[i]t [is] incumbent on [Plaintiffs], not [D]efendant[ ] or the [C]ourt, to identify where they want[ ] partial relief, if full relief [is] not possible." Onishea, 171 F.3d at 1305.  Nowhere in the record have Plaintiffs specified any number of interpreters they would find reasonable.  Additionally, Plaintiffs have not specified any reasonable accommodation besides an interpreter which they would find suitable.  Moreover, these issues are grounded in factual disputes best-suited for the jury.

43-44. Specifically, Plaintiffs assert that "[u]nder these circumstances, to say that accommodating Plaintiffs' disability would somehow put [the Charter School Corporation] over the financial edge and thus constitute a fundamental alteration is simply not credible, is not supported by competent evidence, and is at the very least a disputed issue of fact." Id. at 44.[71] The Charter School Corporation maintains that the Holding Company provides these advances "largely to address a timing issue with respect to the receipt of funds from Sumter County and to aid in the provision of a K-12th grade education." Motion at 34. Further, the evidence reflects that the LLC is "self sustaining" and that the advances from the Holding Company "are not made to supplement its operations." Id. Indeed, nothing in the record contradicts the evidence showing that the LLC is a financially independent program from the Villages Charter Schools and that the LLC operates solely off of course fees. Additionally, nothing in the record establishes that the funds provided by the Holding Company are used for anything but the operations of the Villages Charter Schools.[72] Thus, the evidence in the record regarding the Holding Company and its financial support of the Villages Charter Schools is irrelevant to the question of whether the provision of sign language interpreters for LLC classes would constitute an undue hardship.

------------------------------------------------------------

[71] Plaintiffs further argue that "[t]he [LLC] is operating at a deficit that has always been cured by the parent organization." Response at 10. For this proposition, Plaintiffs cite the deposition of Gina Ritch at pages 53 and 54. However, it seems that Ritch misspoke when she stated that the LLC is running at a deficit because she almost immediately thereafter testified that The Villages Charter School, Inc., has its deficit cured by the Holding Company every year. Ritch Dep. at 53-54.

[72] In the Motion, the Charter School Corporation also argues that the Holding Company "does not have an ongoing commitment to fund deficits of" the Charter School Corporation and that indeed, the Holding Company "has no contractual or legal obligation of any kind to provide advances" to the Charter School Corporation. Motion at 34. However, because the funds provided by the Holding Company do not support the LLC in that the LLC is financially self-sustaining, whether the Holding Company has an ongoing commitment or legal obligation to fund the Charter School Corporation is not determinative for purposes of summary judgment.

### iii. Whether Plaintiffs can sustain a claim for compensatory damages

Having found that there are genuine issues of material fact with respect to whether the Charter School Corporation has failed to provide appropriate and necessary auxiliary aids to ensure that Plaintiffs received an equal opportunity to benefit from the LLC courses, the Court next turns to Plaintiffs' claim for compensatory damages. See Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 344 (11th Cir. 2012) (stating that although a reasonable juror could find that the defendant hospital "failed to provide appropriate and necessary auxiliary aids", "such a failure by itself will not sustain a claim for compensatory damages" because the plaintiffs "must also show by a preponderance that the [h]ospital's failure to provide appropriate auxiliary aids was the result of intentional discrimination"). "To prevail on a claim for compensatory damages under . . . the RA . . ., a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." McCullum v. Orlando Regional Healthcare Sys., Inc., 768 F.3d 1135, 1146-47 (11th Cir. 2014) (citing Liese, 701 F.3d at 342). Thus, although the Court has determined that genuine issues of material facts exist with respect to whether the Charter School Corporation has violated the RA, to avoid summary judgment on their compensatory damages claim, Plaintiffs "must also establish a genuine issue of material fact that [the Charter School Corporation] acted or failed to act, with discriminatory intent." Id. at 1147 n.8. "To establish deliberate indifference, a plaintiff must show that the defendant 'knew that harm to a federally protected right was substantially likely' and 'failed to act on that likelihood.'" Id. at 1147 (quoting Liese, 701 F.3d at 344). Additionally, Plaintiffs must show deliberate

indifference on the part of "an official who at a minimum has authority to address the alleged discrimination to institute corrective measures on the organization's behalf and who has actual knowledge of discrimination in the organization's programs and fails to adequately respond." Liese, 701 F.3d at 349 (alterations and emphasis omitted).  As such, for Plaintiffs' compensatory damages claim to survive summary judgment, "a reasonable juror must be able to find" that a Charter School Corporation official (1) knew that the Charter School Corporation had failed to provide Plaintiffs with appropriate auxiliary aids necessary to ensure effective communication; (2) had the authority to order that aid be provided; and (3) was deliberately indifferent as to the Charter School Corporation's failure to provide aid." Liese, 701 F.3d at 351.

        In the Motion, the Charter School Corporation asserts that "Plaintiffs are not entitled to any compensatory damages . . . because there is no 'intentional discrimination or bad faith' on the part of" the Charter School Corporation.  Motion at 37.  Specifically, the Charter School Corporation argues that "the inability of the [LLC] to provide unlimited American sign language interpreters to [P]laintiffs to attend adult enrichment courses is clearly not enough to support a finding of deliberate indifference."  Id.  Further, the Charter School Corporation asserts that Plaintiffs cannot show deliberate indifference because the Charter School Corporation "has at all times believed and continues to believe that its actions . . . are in compliance with state and federal law."  Id. at 38.

        In opposition, Plaintiffs argue that the deliberate indifference standard is not, as Plaintiffs claim the Charter School Corporation asserts, "that Defendant 'knew its alleged actions were a violation of [P]laintiffs['] federally protected right."  Response at 46.  Instead,

Plaintiffs argue that they can satisfy the first element of their compensatory damages claim

because the Charter School Corporation "knowingly refused an effective accommodation."

Id. With respect to the third element[73] Plaintiffs assert that the following deposition testimony

from Wise "provides conclusive evidence" demonstrating deliberate indifference:

> Well, I think the difference to me is that where does this end.  Let's just say
> that we have a bunch of Chinese people that live in The Villages.  Are we
> going to have interpreters for them in every event in The Villages? So I think
> there's a substantial difference.

Id. at 47 (quoting Wise Dep. at 29-30).

The Eleventh Circuit has repeatedly stated that "a plaintiff cannot establish a claim

under the [RA] alleging that a defendant discriminated against him by failing to provide a

reasonable accommodation unless he demanded such an accommodation."  Gaston v.

Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999); see also U.S. v.

Hialeah Hous. Auth., 418 F. App'x 872, 876 (11th Cir. 2011) (stating that "[t]his Court has

held that under the [RA] and the ADA, 'the duty to provide a reasonable accommodation is

not triggered unless a specific demand for an accommodation has been made' and that

"[d]efendants must have . . . the ability to conduct a meaningful review of the requested

accommodation").  Although there are several plaintiffs who testified that they never

attempted to register for an LLC course and have never requested a sign language

interpreter from LLC,[74] the Charter School Corporation "acknowledges" that there is a futility

---

[73] Plaintiffs do not expressly address the second element.

[74] The following Plaintiffs testified as such: Thomas Hickey (Doc. 131-9 at 25-26); Charles Martin (Doc. 131-20 at 24-25); Robert McDevitt (Doc. 132-4); Kathleen McElwain (Doc. 131-32 at 63-64); Francis Langlois (Doc. 131-14 at 28-29; 31-32); Herbert Pickering (Doc. 131-33 at 23; 27-28); Doris Schwarz (Doc. 131-7 at 36-
(continued...)

exception with respect to [RA] claims.  Motion at 38.  Thus, because the Charter School Corporation does not seek summary judgment with respect to Plaintiffs' RA claims on the grounds that any of the Plaintiffs failed to request an accommodation, the Court will not dismiss any of the Plaintiffs on this basis.

Turning to the first element of Plaintiffs' compensatory damages claims, whether an agent of the Charter School Corporation knew that it failed to provide Plaintiffs with appropriate auxiliary aids necessary to ensure effective communication, the record shows that the Director of the Charter School Corporation, Randy McDaniel, decided that the LLC would not provide sign language interpreters based on his belief that it was not a financially sustainable accommodation and that there was not adequate availability of qualified interpreters.  McDaniel Dep. at 49-51.  As such, a reasonable juror could conclude that without sign language interpreters, Plaintiffs would not have access to effective communication in the LLC courses and that the Charter School Corporation was aware of this fact.  See Liese, 701 F.3d at 351 (reasonable juror could find that doctor knew "he was not effectively communicating with" the deaf patient-plaintiff "and that "[the plaintiff] needed more substantive interpretive aids to understand the nature of and need for her surgery").  Additionally, on this record, a reasonable juror could conclude that an "official" had the authority to order that aid be provided, so Plaintiffs have also established a genuine issue of material fact as to the second element of their compensatory damages claims.

---

[74](...continued)
37); Andrew St. John (Doc. 131-26 at 38-41); Diane St. John (Doc. 131-36 at 31-32); Evelyn Walker (Doc. 131-22 at 16-19); Randall Walker (Doc. 131-21 at 26-28); Mary Wilson (Doc. 131-38 at 25-26, 30); and Shirley Zimmerman (Doc. 131-18 at 30-31).

As to the third element, whether the Charter School Corporation was deliberately indifferent to its failure to provide auxiliary aids, the arguments raised by the Charter School Corporation and Plaintiffs in the Motion and Response both miss the mark.  The Charter School Corporation's belief that its actions are "in compliance with state and federal law" is irrelevant to the question of whether it was deliberately indifferent.  Additionally, Wise's off-the-cuff deposition testimony is not indicative of deliberate indifference with regard to the LLC's refusal to provide sign language interpreters.  Instead, the proper inquiry  is whether the Charter School Corporation knew that Plaintiffs required an auxiliary aid to effectively benefit from the LLC courses but, nevertheless, deliberately refused such aid.  Here, the Charter School Corporation does not appear to argue that they have provided Plaintiffs an effective auxiliary aid under the RA.[75]  Rather, they maintain that the provision of sign language interpreters is cost prohibitive and thus an undue hardship.  As such, a reasonable juror could find that the Charter School Corporation knew that Plaintiffs required sign language interpreters and deliberately failed to provide them.  Accordingly, because there is a genuine issue of material fact with respect to whether the Charter School Corporation's failure to provide sign language interpreters was the result of intentional discrimination, the Motion is denied to the extent the Charter School Corporation seeks summary judgment as to Plaintiffs' claim for compensatory damages as to their RA claims.

---

[75] However, to the extent the Charter School Corporation asserts that the DNS program is an effective auxiliary aid, based on the record before the Court, a reasonable juror could conclude that the Charter School Corporation knew that Plaintiffs required a more effective aid (sign language interpreters, for example) and deliberately refused such aid.

### iv. Whether Plaintiffs are entitled to injunctive relief

Plaintiffs also seek injunctive relief with respect to their RA claim. See Complaint at 58. "To issue a permanent injunction under the . . . [RA], the Court must apply the same factors as it would in any other case in which a plaintiff sought a permanent injunction." H. v. Montgomery Cnty. Bd. of Educ., 784 F. Supp. 2d 1247, 1268 (M.D. Ala. 2011) (citation omitted).

> "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that [she] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

Id. at 1268-69 (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010)). Neither side addresses the factors the Court must consider prior to granting an injunction, "despite the fact that a party seeking summary judgment bears the 'responsibility of informing the district court of the basis for its motion.'" Id. at 1269 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). As such, the Motion is denied to the extent the Charter School Corporation seeks summary judgment as to Plaintiffs' claim for injunctive relief with respect to their RA claims.

In accordance with the foregoing, it is

**ORDERED**:

1. The claims raised by Plaintiff Patricia Smart against Defendants are **DISMISSED with prejudice**.

-103-

2.   Defendants, the Village Center Community Development District and Sumter Landing Community Development District's Motion for Summary Judgment, with Incorporated Memorandum of Law (Doc. 131) is **GRANTED**.[76]

3.   In light of the entry of summary judgment, the Clerk of the Court is directed to **terminate, as moot**, Defendants, the Village Center Community Development District and Sumter Landing Community Development District's Motion in Limine and Incorporated Memorandum of Law (Doc. 155) and Plaintiffs' Motion in Limine to Exclude the FCHR Report (Doc. 164).

4.   Pursuant to Rule 54(b), finding that there is no just reason to delay the entry of final judgment on those claims,[77] the Clerk of the Court is further directed to enter **JUDGMENT** in favor of Defendants the Village Center Community Development District and Sumter Landing Community Development District and against Plaintiffs Louis Schwarz, et al.

5.   Defendant, the Villages Charter School, Inc. d/b/a the Villages Lifelong Learning College's Motion for Summary Judgment and Memorandum of Law (Doc. 132) is **GRANTED, in part, and DENIED, in part**.

---

[76] Footnote deleted pursuant to Order (Doc. 188).

[77] Because the Court has disposed of all claims against the Districts, the Court finds that the balance of judicial administrative interests and the relevant equitable concerns weigh in favor of Rule 54(b) certification. See Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162, 166 (11th Cir. 1997). As is apparent from this Amended Order, although Plaintiffs' ongoing claim against The Villages Charter School, Inc. involves one of the same statutes, that claim is premised on entirely separate facts against a different defendant such that "neither the same issues nor facts would be before the reviewing court more than once." See Explosives Supply Co., Inc. v. Columbia Nitrogen Corp., 691 F.2d 486, 486-87 (11th Cir. 1982).

A.   The Villages Charter School, Inc.'s Motion is **GRANTED** as to Count

II of the Third Amended Complaint.

B.   The Villages Charter School, Inc.'s Motion is **DENIED** as to Count V of

the Third Amended Complaint.

**DONE AND ORDERED** in Chambers, this 29th day of February, 2016.

MARCIA MORALES HOWARD
United States District Judge

lc18

Copies to:

Counsel of Record